# POLLOCK *v.* FARMERS' LOAN AND TRUST COMPANY. (Rehearing.)

# HYDE *v.* CONTINENTAL TRUST COMPANY. (Rehearing.)

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 893, 894.   Argued May 6, 7, 8, 1895. — Decided May 20, 1895.

*Hylton* v. *United States*, 3 Dall. 171, further considered, and, in view of the historical evidence cited, shown to have only decided that the tax on carriages involved was an excise, and was therefore an indirect tax.

In distributing the power of taxation the Constitution retained to the States the absolute power of direct taxation, but granted to the Federal government the power of the same taxation upon condition that, in its exercise, such taxes should be apportioned among the several States according to numbers; and this was done, in order to protect to the States, who were surrendering to the Federal government so many sources of income, the power of direct taxation, which was their principal remaining resource.

It is the duty of the court in this case simply to determine whether the income tax now before it does or does not belong to the class of direct taxes, and if it does, to decide the constitutional question which follows accordingly, unaffected by considerations not pertaining to the case in hand.

Taxes on real estate being indisputably direct taxes, taxes on the rents or income of real estate are equally direct taxes.

Taxes on personal property, or on the income of personal property, are likewise direct taxes.

The tax imposed by sections twenty-seven to thirty-seven, inclusive, of the act of 1894, so far as it falls on the income of real estate and of personal property, being a direct tax within the meaning of the Constitution, and, therefore, unconstitutional and void because not apportioned according to representation, all those sections, constituting one entire scheme of taxation, are necessarily invalid.

THESE cases were decided on the 8th of April, 1895, 157 U. S. 429. Thereupon the appellants filed a petition for a rehearing as follows, entitled in the two cases:

*To the Honorable the Justices of the Supreme Court of the United States :*

Charles Pollock and Lewis H. Hyde, the appellants in these causes, respectfully present their petition for rehearing, and submit the following reasons why their prayer should be granted :

I.  The question involved in these cases was as to the constitutionality of the provisions of the tariff act of August 15, 1894, (sections 27 to 37,) purporting to impose a tax upon incomes.  The court has held that the same are unconstitutional, so far as they purport to impose a tax upon the rent or income of real estate and income derived from municipal bonds. It has, however, announced that it was equally divided in opinion as to the following questions, and has expressed no opinion in regard to them :

(1)  Whether the void provisions invalidate the whole act.

(2)  Whether, as to the income from personal property as such, the act is unconstitutional as laying direct taxes.

(3)  Whether any part of the tax, if not considered as a direct tax, is invalid for want of uniformity.

The court has reversed the decree of the Circuit Court and remanded the case, with directions to enter a decree in favor of complainant in respect only of the voluntary payment of the tax on the rents and income of defendant's real estate and that which it holds in trust, and on the income from the municipal bonds owned or so held by it.

While, therefore, the two points above stated have been decided, there has been no decision of the remaining questions regarding the constitutionality of the act, and no judgment has been announced authoritatively establishing any principle for interpretation of the statute in those respects.  *Etting* v. *Bank of the United States,* 11 Wheat. 59, 78 ; *Durant* v. *Essex Co.,* 7 Wall. 107, 113.

This court, having been established by the Constitution, and its judicial power extending to all cases in law and equity arising under the Constitution and laws of the United States, must necessarily be the ultimate tribunal for the determination of these questions.  In all cases in which such questions

may arise, there can, therefore, be no authoritative decision in reference to the same except by this court.

II. The court early in its history adopted the practice of requiring, if practicable, constitutional questions to be heard by a full court in order that the judgment in such case might, if possible, be the decision of the majority of the whole court.

In *Briscoe* v. *Commonwealth Bank*, 8 Pet. 118, and *City of New York* v. *Miln*, 8 Pet. 120, 122, this rule was announced by Chief Justice Marshall in the following language :

"The practice of this court is, not (except in cases of absolute necessity) to deliver any judgment in cases where constitutional questions are involved, unless four judges concur in opinion, thus making the decision that of a majority of the whole court. In the present cases four judges do not concur in opinion as to the constitutional questions which have been argued. The court therefore direct these cases to be reargued at the next term, under the expectation that a larger number of the judges may then be present."

The same cases were again called at the next term of the court, and the Chief Justice said the court could not know whether there would be a full court during the term ; but as the court was then composed, the constitutional cases would not be taken up (9 Pet. 85). In a note to the cases upon that page, it is stated that during that term, the court was composed of six judges, the full court at the time being seven ; there was then a vacancy occasioned by the resignation of Mr. Justice Duval, which had not yet been filled.

The rule laid down by Chief Justice Marshall has been frequently followed. Reference may be made to the case of *Home Insurance Company* v. *New York*, 119 U. S. 129, 148. Mr. Chief Justice Waite there announced that the judgment of the Supreme Court of the State of New York was affirmed by a divided court. At the time, Mr. Justice Woods was ill and absent during the whole of the term, and took no part in any of the cases argued at that term. There were, therefore, only eight members of the court present. A petition for reargument was presented upon the ground that the principle announced by Mr. Chief Justice Marshall should be followed,

and that the constitutional question involved was sufficiently important to demand a decision concurred in by a majority of the whole court. The petition was granted, 122 U. S. 636, and the case was not reargued until the bench was full. 134 U. S. 594, 597. This practice is recognized as established in Phillips' Practice, at page 380.

III. It is respectfully submitted that no case could arise more imperatively requiring the application of the rule than the present. The precise question involved is the constitutionality of an act of Congress affecting the citizens of the country generally. That act has been held unconstitutional in important respects; its constitutionality has not been authoritatively decided as to the remaining portions. These complainants and appellants may well urge, that these serious constitutional questions should be finally decided before their trustee expends their funds in voluntary payment of the tax. In addition, it is manifest that, until some decision is reached, the courts will be overwhelmed with litigation upon these questions, and the payment and collection of the tax will be most seriously embarrassed.

Every tax payer to any considerable extent will pay the tax under protest and sue to recover the same back, and if necessary sue out his writ of error to this court. The court will of necessity be burdened with rearguments of these questions without number until they are finally settled. Still further, as the matter now stands, it has been decided that a tax upon the income of land is unconstitutional, while the court has made no decision as to the validity of the tax upon income of personal property. Serious questions have, therefore, already arisen as to what is, in fact, to be deemed the income of real estate, and what is the income of real and what of personal property, in cases where both are employed in the production of the same income.

Your petitioners, therefore, respectfully pray that these cases be restored to the docket and a reargument be ordered as to the questions upon which the court was evenly divided in opinion. In case, however, this motion should be denied, your petitioners pray that the mandate be amended by order-

ing a new trial in the court below, so that the court below may now determine the questions (1) whether or not the invalidity of the statute in the respects already specified renders the same altogether invalid, and (2) whether or not the act is constitutional in the respects not decided by this court.

The undersigned, members of the bar of this honorable court, humbly conceive that it is proper that the appeals herein should be reheard by this court, if this court shall see fit so to order, and they therefore respectfully certify accordingly.

Washington, April 15, 1895.

JOSEPH H. CHOATE,    WILLIAM D. GUTHRIE,

CLARENCE A. SEWARD,    DAVID WILLCOX,

BENJAMIN H. BRISTOW,    CHARLES STEELE,

*Of counsel for appellants.*

To this petition *Mr. Attorney General* made the following suggestion on the part of the United States:

The United States respectfully represents that, if a rehearing is granted in the above-entitled cases, the rehearing should cover all the legal and constitutional questions involved, and not merely those as to which the court are equally divided.

I. Whether a tax on incomes generally, inclusive of rents and interest or dividends from investments of all kinds, is or is not a direct tax within the meaning of the Federal Constitution is a matter upon which, as an original question, the government has really never been heard.

Its position at the argument was that the question had been settled — by an exposition of the Constitution practically contemporaneous with its adoption — by a subsequent unbroken line of judicial precedents — by the concurring and repeated action of all the departments of the government — and by the consensus of all text writers and authorities by whom the subject has heretofore been considered.

II. The importance to the government of the new views of its taxing power, announced in the opinion of the Chief Justice, can hardly be exaggerated.

First. Pushed to their logical conclusion, they practically

exclude from the direct operation of the power all the real estate of the country and all its invested personal property. They exclude it because, if realty and personalty are taxable only by the rule of apportionment, the inevitable inequalities resulting from such a plan of taxation are so gross and flagrant as to absolutely debar any resort to it.

That such inequalities must result is practically admitted, the only suggestion in reply being that the power to directly tax realty and personalty was not meant for use as an ordinary, every-day power; that the United States was expected to rely for its customary revenues upon duties, imposts, and excises; and that it was meant it should impose direct taxes only in extraordinary emergencies and as a sort of *dernier resort*.

It is submitted that a construction of the Constitution of such vital importance in itself and requiring in its support an imputation to its framers of a specific purpose which nothing in the text of the Constitution has any tendency to reveal, cannot be too carefully considered before being finally adopted.

Second. Though of minor consequence, it is certainly relevant to point out that, if the new exposition of the Constitution referred to is to prevail, the United States has under previous income-tax laws collected vast sums of money which on every principle of justice it ought to refund, and which it must be assumed that Congress will deem itself bound to make provision for refunding by appropriate legislation.

Respectfully submitted.

> RICHARD OLNEY,
> *Attorney General.*

Thereupon the following announcement was made, May 6, 1895.

THE CHIEF JUSTICE. In these cases appellants made application for a rehearing as to those propositions upon which the court was equally divided, whereupon the Attorney General presented a suggestion that if any rehearing were granted it should embrace the whole case. Treating this suggestion as amounting in itself to an application for a rehearing, and not desiring to restrict the scope of the argument, we set down

both applications to be heard to-day before a full bench, which the anticipated presence of our brother Jackson, happily realized, enabled us to do. No further argument will be desired. We were obliged, however, to limit the number of counsel to two on each side; but as to the time, we await the suggestions of counsel.

Five hours were then granted to each side in the argument of these cases, on motion of *Mr. Joseph H. Choate* for the appellants.

*Mr. William D. Guthrie* and *Mr. Joseph H. Choate* for appellants. *Mr. Clarence A. Seward, Mr. Benjamin H. Bristow, Mr. David Willcox, Mr. Victor Morawetz,* and *Mr. Charles Steele* were on their brief, which contained the following historical matter, not on the former briefs:

I. *Early Laws of the Colonies and States showing the Subjects of Taxation.*

New Hampshire. — The assessors were directed to take the estimated produce of the land as a basis; while mills, wharves, and ferries were valued at one-twelfth of their yearly net income, after deducting repairs. Act of February 22, 1794, Laws of N. H. 1793, p. 471.

Massachusetts. — New Plymouth Colony, in 1643, instructed the assessors to rate all the inhabitants of that colony "according to their estates or families, that is, according to goods, lands and improved faculties and personal abilities." Records of Colony of New Plymouth, Pulsifer's ed. XI, 42.

The Massachusetts Bay Company, by its order of 1646 (Colonial Records of Massachusetts Bay, II, 173, 213, and III, 88), assessed "laborers, artificers, and handicraftsmen, and for all such persons as by advantage of their arts and trades are more enabled to help bear the public charges than the common laborers and workmen, as butchers, bakers, brewers, victuallers, smiths, carpenters, tailors, shoemakers, joiners, barbers, millers and masons, with all other manual persons and artists, such are to be rated for returns and gains proportionable unto other men, for the produce of their estates."

The law thus remained and was gradually extended to other forms of earnings than merely of "manual persons and artists."   In 1706, the tax was imposed on "incomes by any trade or faculty."   In 1738, the act was amended by adding the words "business or employment."   The act of 1777, which was continued by the state constitution, levied the tax on "incomes from any profession, faculty, handicraft, trade or employment."   This still remains the law, except that the word "faculty" has been omitted since 1821, and the word "handicraft" since 1849.

. All estates, real and personal, were to be rated in 1692 "at a quarter part of one year's value or income thereof."   In 1693 it was provided that "all houses, warehouses, tan-yards, orchards, pastures, meadows and lands, mills, cranes and wharves be estimated at seven years' income as they are or may be let for."   A. R. P., M. B. I., 29, 92, 413.

Rhode Island. — In 1774, the statute directed "that the assessors in all and every rate shall consider all persons who make profit by their faculties and shall rate them accordingly."   Acts and Laws of Rhode Island, Newport, 1845, p. 295.   The rate makers were "to take a narrow inspection of the lands and meadows and to judge of the yearly profit at their wisdom and discretion."   Colonial Records of R. I., III, 300.

. Connecticut. — A faculty tax was placed on all manual persons and artists, following the Massachusetts law of 1646, and these provisions were frequently repeated in the laws of the seventeenth century.   1 Colonial Records, 548; see, too, Laws of Connecticut, published in 1769.

New York. — In 1743 the assessors took an oath to estimate the property by the product — a shilling for every pound. Oath of Assessors, Laws of 1743, sec. 13;  Van Schaack's Laws, 1691–1773.

New Jersey. — Not only property owners, but "also all other persons within this province who are freemen and are artificers or follow any trade or merchandizing, and also all innkeepers, ordinary keepers and other persons in places of profit within this province," shall be liable to be assessed for

the same according to the discretion of the assessors.  Laws of New Jersey, 1664–1701, Jenning and Spicer, pp. 494, 1684.

Pennsylvania. — The statute of March 27, 1782, provided among other things that " all offices and posts of profit, trades, occupations and professions (excepting ministers and school-masters), shall be rated at the discretion of the township, ward or district assessors, and two assistant freeholders of the proper township, ward or district having due regard to the profits arising from them."   2 Dallas' Digest, 8.

Delaware. — Even after 1796, real estate was still valued according to the rents arising therefrom.   State Papers, 1 Finance, 439.

Maryland. — In 1777, a law was passed which imposed an assessment of one-quarter of one per cent on " the amount re-ceived yearly by every person for any public office or profit of an annuity or stipend, and on the clear yearly profit of every person practising law or physic, every hired clerk acting with-out commission, every factor, agent or manager trading or using commerce in this State."   Maryland Laws of 1777, chap. 22, §§ 5–6.

Virginia. — In 1786, a tax was imposed upon attorneys, merchants, physicians, surgeons and apothecaries.   12 Hen-ning's Statutes, 283 ; 13, 114.

In 1793, the tax on city property was " five-sixths of one per cent of the ascertained or estimated yearly rent or in-come."   Act of 1793, Shepherd's Stat. at Large, Va., 1792, 1806, 1, 224; American State Papers, 1 Finance, 481.

South Carolina. — In 1701, a law was enacted which im-posed a tax on the citizens according to their estates, stocks and liabilities or the profits that any of them do make off or from any public office or employment.   Two years later this tax was extended so as to assess individuals on "their estates, merchandises, stocks, abilities, offices and places of profit of whatever kind or nature soever."   Cooper Stat. at Large, S. S. 2, 36, 183.

II. *Report of Oliver Wolcott, Jr., Secretary of the Treas-ury to the House of Representatives on Direct Taxes, Decem-ber 14, 1796.*

This report (7 American State Papers, 1 Finance, 414–431) was made in obedience to a resolution of the House of Representatives, passed on the 4th day of April, 1796.   The report says: " The duty enjoined is to 'report a plan for laying and collecting *direct taxes* by apportionment among the several States agreeably to the rule prescribed by the Constitution; adapting the same as nearly as may be to such objects of direct taxation and such modes of collection, as may appear by the laws and practice of the States respectively to be most eligible in each,' " recommends a *direct tax* of $1,484,000, and states the apportionment thereof among the States.   The report states among the articles taxed in States in addition to land as follows:

Vermont. — Cattle and horses, *money on hand or due*, and obligations to pay money.   Assessments proportioned to the profits of all lawyers, traders and owners of mills, according to the judgment or discretion of the listers or assessors (p. 418).

New Hampshire. — Stock in trade, *money* on hand or *at interest* more than the owner pays interest for, and all *property in public funds*, estimated at its real value; *mills, wharves and ferries at one-twelfth part of their yearly net income, after deducting repairs.*

Massachusetts. — Vessels, stock in trade, securities, *all moneys* on hand or *placed out at interest* exceeding the sum due on interest by the individual creditor; silver plate, *stock owned by stockholders in any bank*, horses, cattle and swine (p. 420).

Rhode Island. — Polls and the collective mass of property, both real and personal (p. 422).

Connecticut. — Stock, carriages, plate, clocks and watches, *credits on interest* exceeding the debts due on interest by the individual creditors ; assessments apportioned to the estimated gains or profits arising from any and all lucrative professions, trades and occupations (p. 423).

New Jersey. — Ferries, fisheries, vessels, carriages, personal taxes on shopkeepers, single men and slaves (p. 426).

New York. — Assessments in the towns determined by a

discretionary estimate of the collective and individual wealth of corporations and individuals (p. 425).

Pennsylvania. — Prior to 1789, the time of servitude of bound servants, slaves, horses and cattle, plate, carriages; ferries, all offices and posts of profit, trades, occupations and professions, with reference to their respective profits.   Subsequently ground rents, slaves, horses, cattle, provisions, trades and callings (pp. 427, 428).

Delaware. — Taxes have been hitherto collected of the estimated annual income of the inhabitants of the State, with reference to specific objects.   A statute has been passed during the past year declaring that all real and personal property shall be taxed; provision is made for ascertaining the stock of merchants, traders, mechanics and manufacturers for the purpose of regulating assessments upon such persons, proportioned to their gains and profits; *ground rents are estimated at one hundred pounds for every eight pounds of rent.   Rents of houses and lots in cities, towns and villages at one hundred pounds for every twelve pounds of rent reserved* (p. 429).

Maryland. — Taxes are imposed on the mass of property in general, there are licenses for attorneys at law for admission to the bar £3, and the like sum annually during his continuance to practise; licenses to retail spirituous liquors; to keep taverns; for marriage (p. 430).

Virginia. — *A tax on lots and houses in towns, and the tenant or proprietor was required to disclose on oath or affirmation the amount of rent paid or received by them respectively;* ordinary licenses; slaves, stud horses and jackasses, ordinary licenses, billiard tables, legal proceedings (pp. 431, 432).

North Carolina. — Slaves, stud horses, licensed ordinaries and houses for retailing spirituous liquors in small quantities, legal proceedings, billiard tables (pp. 433, 434).

South Carolina. — On every £100 of stock in trade, factorage, employment, faculties and professions, slaves, auction sales (p. 425).

Georgia. — Stock-in-trade, funded debt of the United States, slaves, all professors of law or physic and all factors and brokers, billiard tables (p. 436).

The report continues: "*Lands in Massachusetts and New Hampshire are taxed according to their produce or supposed annual rent or profit.*"

Stock employed in trade or manufactures and *moneys loaned on interest* are taxed on different principles in different States.

Assessments at discretion on the supposed property or income of individuals are permitted in various degrees and under different modifications in some States. In other States all taxes attach to certain defined objects at prescribed rates.

It is assumed as a principle that all objects of income, whether consisting of *skilled labor* or capital, bear certain relations to each other, *which may be defined to be their natural value.*

*The value, therefore, is determined by the degree of labor,* skill and expense necessary to be bestowed on the subject (p. 437).

Taxes on stock employed in trade and manufactures *and on moneys loaned at interest. It is believed that direct taxes on these subjects, except in extraordinary and temporary emergencies, are impolitic, unequal and delusive* (p. 439).

Taxes on lands. *Taxes proportioned to the value of improved lands, and taxes proportioned to their produce or actual income or rent are nearly, if not entirely, alike in principle* (p. 439).

As the Constitution has established a rule of apportionment, there appears to be no necessity that the principles of valuation should be uniform in all the States (p. 441).

In the schedule annexed to the report, under the head of "The objects of taxation," are the following, among others:

New Hampshire. — *Money* on hand or *at interest;* three-quarters per cent (p. 442).

Massachusetts. — *Funded securities. Securities of the State* or United States; *money at interest;* money on hand (p. 437).

Connecticut. — *Amount of money at interest;* assessments on lawyers, shop-keepers, surgeons, physicians, merchants, etc. (p. 455).

Virginia. — Ordinary licenses (p. 459).

South Carolina. — On faculties, &c. (p. 464).

It should be observed that while the secretary discusses in

much detail the advantages and disadvantages of levying a direct tax upon the various kinds of personal properties, there is not a suggestion of doubt that they could constitutionally be taxed directly.

*Mr. Attorney General* and *Mr. Assistant Attorney General Whitney* for the United States.

Their briefs and argument on the rehearing contained among other things the following new matter bearing upon the direct-tax question, and in particular upon the question relating to the income of real and personal property :

I. *Historical discussion.*  The tax clauses of the Constitution, when they left the committee on style, were worded with great care and with reference to some standard classification which it was assumed would solve all difficulties.  The classification was as follows : direct taxes by apportionment ; capitation taxes by apportionment ; duties, imposts and excises by uniformity.  The classification of capitation taxes among the direct taxes came in at the last moment by an amendment.  The phrase "direct" tax had then no legal meaning. It was borrowed from political economy ; and with some economists included only land taxes (Locke and Mercier de la Rivière), while with others it included also capitation taxes, but not taxes on the profits of money or industry, etc. (Turgot). The word "duties" had, however, a legal signification which was appealed to by Mr. Wilson (afterwards Mr. Justice Wilson) speaking in the Constitutional Convention for the Committee on Detail (5 Elliott's Debates, 432).  He evidently referred to the familiar English use of the term found in Blackstone (1 Bl. Com. c. VIII) and in the English statute books.  These duties, as summed up in Mr. Pitt's consolidated fund act of 1787, (27 Geo. III. c. 13,) included the "duties on customs, excises and stamps" and also the duties on hackney coaches and chairs ; on hawkers and pedlars ; on houses, windows and lights ; on inhabited houses ; on salaries and pensions ; on shops ; on coaches, etc..  The stamp duties, as shown by the famous stamp act of 1765, (5 Geo. III. c. 12,) included

duties on bonds for securing payment of money; on grants or deeds of land; on leases, conveyances, mortgages, records of deeds, etc. Pitt's famous act of 1799 levied a *duty* on incomes. The only "tax" levied in Great Britain during that century (capitation taxes being obsolete) was that known as the "land tax." In fact, in Great Britain the words "tax" and "duty" had had legal definitions for a century, exclusive of each other, settled and unvarying in their statutory use. A tax was laid upon all property, or upon all real property, at a valuation, and always by a rule of apportionment. Everything that was not a tax in this restricted sense was a duty. No duties were laid by any system of apportionment; all were laid by a rule of uniformity. There was an accuracy and consistency in the statutory phraseology which is very rare to find. This is the more remarkable, as in colloquial parlance the words were used very loosely.

In taxation there was no uniform system or approach to a uniform system among the States. The terminology differed in different States; and there was nowhere a recognized definition of "duties" to which Mr. Wilson's explanation can have referred. For this reason, and for the reason that the English classification was well settled, familiar to American lawyers, and based on the distinction between the system of apportionment and the system of uniformity, it is believed that the word "duties" in the Constitution is used in the broad English sense. This theory is entirely consistent with the *Hylton, Pacific Insurance, Veazie Bank, Scholey* and *Springer cases.* It also explains why the debate turned not upon what taxes should be apportioned, but upon how the apportionment should be made; not upon what duties should be laid by the rule of uniformity, but whether they might be local (like the English duty upon hackney coaches in London and vicinity), or must extend throughout the United States. It is also to be noticed that a general property tax in a large State or nation, if laid by valuation, must necessarily be apportioned. This is because the valuing must be done by local people. Each assessor endeavors to favor his own locality by a low rating. Each of the three great English systems of

general property taxes (the "fifteenths and tenths," the "sub-sidies" and the land tax of William and Mary) very quickly reached the stage of a permanent apportionment, for the same reason that such taxes in America have usually been executed by means of periodical valuations or an annual equal-ization by a board of state officers.

Hence, by the words "direct tax," as distinguished from duties, the delegates had in mind a general apportioned tax upon property by valuation.   As some of the American sys-tems included all personalty as well as land in such a tax, doubts afterwards arose whether a general personalty tax by valuation was a direct tax.   There is no sufficient foundation for the theory that any specific duties, whether upon real or personal property, were included in the term, and the then unknown general income tax remained to be classed by anal-ogy when it should be discovered.

The proceedings of the state conventions of 1788 are not competent evidence upon this point.   *Aldridge* v. *Williams,* 3 How. 1, 24; *United States* v. *Union Pacific Railroad,* 91 U. S. 72, 79; *Taylor* v. *Taylor,* 10 Minnesota, 107.   Few are re-ported at all; and those not fully.   The most important part of the debates is often omitted.   2 Elliott's Debates, 101, 104, 109.   The controversial literature of that time is also incom-petent; nor do these proceedings and literature afford any evidence against our theory, except from Madison and a few others, whose own theories were squarely overruled by the *Hylton case.*

The departmental reports and the proceedings and acts of Congress during the first decade after the Constitution confirm our theory of the case.   They show that the word "duty" was used in the broad English sense and applicable to specific in-direct taxes upon real and personal property, such as taxes on conveyances, successions, auction sales, etc.; and also that there was no principle forbidding such duties, or direct taxation of any kind, in times of peace.   Acts of March 3, 1791, c. 15; June 9, 1794, c. 65; July 6, 1797, c. 11; Report of Ways and Means Committee, Annals of Congress, 1796, p. 791; and see other debates and reports in Annals of Congress 1789–98

Mr. Madison seems to have been the only prominent member of the Constitutional Convention who took a different view.

II. *Personal property taxes.* There was never any doubt that taxes on choses in action were indirect taxes or duties. They were "stamp duties" as shown by the famous English stamp act of 1765 and the other similar acts of that century, and by the United States stamp act of 1797. See also 1 Elliott's Debates, pp. 368–9. The question debated in the *Hylton case* concerned duties on choses in possession.

III. *Rentals.* Rentals actually collected can be subjected to a duty laid by the rule of uniformity. for the following reasons : A specific tax on a specific class of real property, laid by the rule of uniformity, as on houses or windows, was a duty under the legal definitions of the last century; such a tax cannot have been intended to be apportioned; it has no relation to either the quantity or the valuation of the land; it is a tax not resting on the land, but placed on the landlord or ex-landlord with respect to the land. See Platt on Covenants, pp. 222–3, 215; *Jeffrey's Case,* 5 Rep. 66 *b*; *Theed* v. *Starkey,* 8 Mod. 314; *Case* v. *Stephens,* Fitzgibbon, 297; *Palmer* v. *Power,* 4 Irish C. L. (1854) 191; *Van Rensselaer* v. *Dennison,* 8 Barb. 23; it is not a direct tax in political economy, as a tax on house rent falls largely on the occupier, 2 Mill's Political Economy, ed. 1864, pp. 429–431; Seligman on Shifting and Incidence of Taxation; Secretary Wolcott's Report, 1796, 7 American State Papers; it is less direct than a succession tax, and therefore within the *Scholey case.*

It is said that what cannot be done directly cannot be done indirectly. This is undoubtedly true when correctly interpreted. It cannot mean in a broad sense that whatever is taxed directly cannot be taxed. indirectly, because the very distinction under consideration is one between direct and indirect taxation. The correct application of this rule, as we understand it, is that no tax can be laid under the rule of uniformity which in its actual incidence is substantially or approximately the same as the tax which the Constitution intends should be levied by the rule of apportionment. There is no such identity between a tax on rents actually collected, and a

general land tax by valuation. If it could be separately considered, it would be analogous not to a property tax, but to an occupation duty.

It is not, however, a tax on rentals at all. It is not a tax measured by anything present. It is measured simply by the taxpayer's ability to pay as indicated by his income for the previous year. The rentals have become moneys inextricably mingled with the other funds of the taxpayer.

Mr. Chief Justice Fuller delivered the opinion of the court.

Whenever this court is required to pass upon the validity of an act of Congress as tested by the fundamental law enacted by the people, the duty imposed demands in its discharge the utmost deliberation and care, and invokes the deepest sense of responsibility. And this is especially so when the question involves the exercise of a great governmental power, and brings into consideration, as vitally affected by the decision, that complex system of government, so sagaciously framed to secure and perpetuate "an indestructible Union, composed of indestructible States."

We have, therefore, with an anxious desire to omit nothing which might in any degree tend to elucidate the questions submitted, and aided by further able arguments embodying the fruits of elaborate research, carefully reëxamined these cases, with the result that, while our former conclusions remain unchanged, their scope must be enlarged by the acceptance of their logical consequences.

The very nature of the Constitution, as observed by Chief Justice Marshall, in one of his greatest judgments, "requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves." "In considering this question, then, we must never forget, that it is a Constitution that we are expounding." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407.

As heretofore stated, the Constitution divided Federal taxa-

tion into two great classes, the class of direct taxes, and the class of duties, imposts, and excises; and prescribed two rules which qualified the grant of power as to each class.

The power to lay direct taxes apportioned among the several States in proportion to their representation in the popular branch of Congress, a representation based on population as ascertained by the census, was plenary and absolute; but to lay direct taxes without apportionment was forbidden. The power to lay duties, imposts, and excises was subject to the qualification that the imposition must be uniform throughout the United States.

Our previous decision was confined to the consideration of the validity of the tax on the income from real estate, and on the income from municipal bonds. The question thus limited was whether such taxation was direct or not, in the meaning of the Constitution; and the court went no farther, as to the tax on the income from real estate, than to hold that it fell within the same class as the source whence the income was derived, that is, that a tax upon the realty and a tax upon the receipts therefrom were alike direct; while as to the income from municipal bonds, that could not be taxed because of want of power to tax the source, and no reference was made to the nature of the tax as being direct or indirect.

We are now permitted to broaden the field of inquiry, and to determine to which of the two great classes a tax upon a person's entire income, whether derived from rents, or products, or otherwise, of real estate, or from bonds, stocks, or other forms of personal property, belongs; and we are unable to conclude that the enforced subtraction from the yield of all the owner's real or personal property, in the manner prescribed, is so different from a tax upon the property itself, that it is not a direct, but an indirect tax, in the meaning of the Constitution.

The words of the Constitution are to be taken in their obvious sense, and to have a reasonable construction. In *Gibbons* v. *Ogden*, Mr. Chief Justice Marshall, with his usual felicity, said: " As men, whose intentions require no concealment, generally employ the words which most directly and aptly

express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it must be understood to have employed words in their natural sense, and to have intended what they have said." 9 Wheat. 1, 188. And in *Rhode Island* v. *Massachusetts,* where the question was whether a controversy between two States over the boundary between them was within the grant of judicial power, Mr. Justice Baldwin, speaking for the court, observed: " The solution of this question must necessarily depend on the words of the Constitution; the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions of the people of and in the several States; together with a reference to such sources of judicial information as are resorted to by all courts in construing statutes, and to which this court has always resorted in construing the Constitution." 12 Pet. 657, 721.

We know of no reason for holding otherwise than that the words " direct taxes," on the one hand, and " duties, imposts and excises," on the other, were used in the Constitution in their natural and obvious sense. Nor, in arriving at what those terms embrace, do we perceive any ground for enlarging them beyond, or narrowing them within, their natural and obvious import at the time the Constitution was framed and ratified.

And, passing from the text, we regard the conclusion reached as inevitable, when the circumstances which surrounded the convention and controlled its action and the views of those who framed and those who adopted the Constitution are considered.

We do not care to retravel ground already traversed; but some observations may be added.

In the light of the struggle in the convention as to whether or not the new Nation should be empowered to levy taxes directly on the individual until after the States had failed to respond to requisitions — a struggle which did not terminate until the amendment to that effect, proposed by Massachusetts and concurred in by South Carolina, New Hampshire, New York, and Rhode Island, had been rejected — it would seem beyond

reasonable question that direct taxation, taking the place as it did of requisitions, was purposely restrained to apportionment according to representation, in order that the former system as to ratio might be retained, while the mode of collection was changed.

This is forcibly illustrated by a letter of Mr. Madison of January 29, 1789, recently published,[1] written after the ratification of the Constitution, but before the organization of the government and the submission of the proposed amendment to Congress, which, while opposing the amendment as calculated to impair the power, only to be exercised in extraordinary emergencies," assigns adequate ground for its rejection as substantially unnecessary, since, he says, " every State which chooses to collect its own quota may always prevent a Federal collection, by keeping a little beforehand in its finances, and making its payment at once into the Federal treasury."

The reasons for the clauses of the Constitution in respect of direct taxation are not far to seek.    The States, respectively, possessed plenary powers of taxation.    They could tax the property of their citizens in such manner and to such extent as they saw fit ; they had unrestricted powers to impose duties or imposts on imports from abroad, and excises on manufactures, consumable commodities, or otherwise.    They gave up the great sources of revenue derived from commerce ; they retained the concurrent power or levying excises, and duties if covering anything other than excises ; but in respect of them the range of taxation was narrowed by the power granted over interstate commerce, and by the danger of being put at disadvantage in dealing with excises on manufactures.    They retained the power of direct taxation, and to that they looked as their chief resource ; but even in respect of that, they granted the concurrent power, and if the tax were placed by both governments on the same subject, the claim of the United States had preference.    Therefore, they did not grant the power of direct taxation without regard to their own condition

---

[1] By Mr. Worthington C. Ford in The Nation, April 25, 1895 ; republished in 51 Albany Law Journal, 292.

and resources as States; but they granted the power of apportioned direct taxation, a power just as efficacious to serve the needs of the general government, but securing to the States the opportunity to pay the amount apportioned, and to recoup from their own citizens in the most feasible way, and in harmony with their systems of local self-government. If, in the changes of wealth and population in particular States, apportionment produced inequality, it was an inequality stipulated for, just as the equal representation of the States, however small, in the Senate, was stipulated for. The Constitution ordains affirmatively that each State shall have two members of that body, and negatively that no State shall by amendment be deprived of its equal suffrage in the Senate without its consent. The Constitution ordains affirmatively that representatives and direct taxes shall be apportioned among the several States according to numbers, and negatively that no direct tax shall be laid unless in proportion to the enumeration.

The founders anticipated that the expenditures of the States, their counties, cities, and towns, would chiefly be met by direct taxation on accumulated property, while they expected that those of the Federal government would be for the most part met by indirect taxes. And in order that the power of direct taxation by the general government should not be exercised, except on necessity; and, when the necessity arose, should be so exercised as to leave the States at liberty to discharge their respective obligations, and should not be so exercised, unfairly and discriminatingly, as to particular States or otherwise, by a mere majority vote, possibly of those whose constituents were intentionally not subjected to any part of the burden, the qualified grant was made. Those who made it knew that the power to tax involved the power to destroy, and that, in the language of Chief Justice Marshall, in *McCulloch* v. *Maryland,* " the only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation." 4 Wheat. 428. And they retained this security by providing that direct taxation and representation in

the lower house of Congress should be adjusted on the same measure.

Moreover, whatever the reasons for the constitutional provisions, there they are, and they appear to us to speak in plain language.

It is said that a tax on the whole income of property is not a direct tax in the meaning of the Constitution, but a duty, and, as a duty, leviable without apportionment, whether direct or indirect. We do not think so. Direct taxation was not restricted in one breath, and the restriction blown to the winds in another.

Cooley (On Taxation, p. 3) says that the word "*duty*" ordinarily " means an indirect tax imposed on the importation, exportation or consumption of goods; " having " a broader meaning than *custom*, which is a duty imposed on imports or exports; " that " the term *impost* also signifies any tax, tribute or duty, but it is seldom applied to any but the indirect taxes. An *excise* duty is an inland impost, levied upon articles of manufacture or sale, and also upon licenses to pursue certain trades or to deal in certain commodities."

In the Constitution, the words " duties, imposts and excises" are put in antithesis to direct taxes. Gouverneur Morris recognized this in his remarks in modifying his celebrated motion, as did Wilson in approving of the motion as modified.  5 Ell. Deb. (Madison Papers) 302.  And Mr. Justice Story, in his Commentaries on the Constitution, (§ 952,) expresses the view that it is not unreasonable to presume that the word " duties" was used as equivalent to "customs " or "imposts " by the framers of the Constitution, since in other clauses it was provided that " No tax or duty shall be laid on articles exported from any State;" and that " No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; " and he refers to a letter of Mr. Madison to Mr. Cabell, of September 18, 1828, to that effect.  3 Madison's Writings, 636.

In this connection it may be useful, though at the risk of repetition, to refer to the views of Hamilton and Madison as

thrown into relief in the pages of the Federalist, and in respect of the enactment of the carriage tax act, and again to briefly consider the *Hylton case,* 3 Dall. 171, so much dwelt on in argument.

The act of June 5, 1794, c. 45, 1 Stat. 373, laying duties upon carriages for the conveyance of persons, was enacted in a time of threatened war.   Bills were then pending in Congress to increase the military force of the United States, and to authorize increased taxation in various directions.   It was, therefore, as much a part of a system of taxation in war times, as was the income tax of the war of the rebellion.   The bill passed the House on the twenty-ninth of May, apparently after a very short debate.   Mr. Madison and Mr. Ames are the only speakers on that day reported in the Annals.   "Mr. Madison objected to this tax on carriages as an unconstitutional tax ; and, as an unconstitutional measure, he would vote against it."   Mr. Ames said : "It was not to be wondered at if he, coming from so different a part of the country, should have a different idea of this tax from the gentleman who spoke last.   In Massachusetts, this tax had been long known; and there it was called an excise.   It was difficult to define whether a tax is direct or not.   He had satisfied himself that this was not so."   Annals, 3d Cong. 730.

On the first of June, 1794, Mr. Madison wrote to Mr. Jefferson : "The carriage tax, which only struck at the Constitution, has passed the House of Representatives."   3 Madison's Writings, 18.   The bill then went to the Senate, where, on the third day of June, it "was considered and adopted," Annals, 3d Cong. 119, and on the following day it received the signature of President Washington.   On the same third day of June the Senate considered "an act laying certain duties upon snuff and refined sugar;" "an act making further provisions for securing and collecting the duties on foreign and domestic distilled spirits, stills, wines, and teas;" "an act for the more effectual protection of the Southwestern frontier;" "an act laying additional duties on goods, wares and merchandise, etc.;" "an act laying duties on licenses for selling wines and foreign distilled spirituous liquors by retail;" and "an act laying duties on property sold at auction."

It appears then that Mr. Madison regarded the carriage tax bill as unconstitutional, and accordingly gave his vote against it, although it was to a large extent, if not altogether, a war measure.

Where did Mr. Hamilton stand? At that time he was Secretary of the Treasury, and it may therefore be assumed, without proof, that he favored the legislation. But upon what ground? He must, of course, have come to the conclusion that it was not a direct tax. Did he agree with Fisher Ames, his personal and political friend, that the tax was an excise? The evidence is overwhelming that he did.

In the thirtieth number of the Federalist, after depicting the helpless and hopeless condition of the country growing out of the inability of the confederation to obtain from the States the moneys assigned to its expenses, he says: "The more intelligent adversaries of the new Constitution admit the force of this reasoning; but they qualify their admission, by a distinction between what they call *internal* and *external* taxations. The former they would reserve to the state governments; the latter, which they explain into commercial imposts, or rather duties on imported articles, they declare themselves willing to concede to the Federal head." In the thirty-sixth number, while still adopting the division of his opponents, he says: "The taxes intended to be comprised under the general denomination of internal taxes, may be subdivided into those of the *direct* and those of the *indirect* kind. . . . As to the latter, *by which must be understood duties and excises on articles of consumption,* one is at a loss to conceive, what can be the nature of the difficulties apprehended." Thus we find Mr. Hamilton, while writing to induce the adoption of the Constitution, *first,* dividing the power of taxation into *external* and *internal,* putting into the former the power of imposing duties on imported articles and into the latter all remaining powers; and, *second,* dividing the latter into *direct* and *indirect,* putting into the latter, duties and excises on articles of consumption.

It seems to us to inevitably follow that in Mr. Hamilton's judgment at that time all internal taxes, except duties and

excises on articles of consumption, fell into the category of direct taxes.

Did he, in supporting the carriage tax bill, change his views in this respect? His argument in the *Hylton case* in support of the law enables us to answer this question. It was not reported by Dallas, but was published in 1851 by his son in the edition of all Hamilton's writings except the Federalist. After saying that we shall seek in vain for any legal meaning of the respective terms " direct and indirect taxes," and after forcibly stating the impossibility of collecting the tax if it is to be considered as a direct tax, he says, doubtingly : " The following are presumed to be the only direct taxes. Capitation or poll taxes. Taxes on lands and buildings. General assessments, whether on the whole property of individuals, or on their whole real or personal estate ; all else must of necessity be considered as indirect taxes." " *Duties, imposts and excises* appear to be contradistinguished from *taxes.*" " If the meaning of the word *excise* is to be sought in the British statutes, it will be found to include the duty on carriages, which is there considered as an *excise.*" " Where so important a distinction in the Constitution is to be realized, it is fair to seek the meaning of terms in the statutory language of that country from which our jurisprudence is derived." 7 Hamilton's Works, 848. Mr. Hamilton therefore clearly supported the law which Mr. Madison opposed, for the same reason that his friend Fisher Ames did, because it was an excise, and as such was specifically comprehended by the Constitution. Any loose expressions in definition of the word " direct," so far as conflicting with his well-considered views in the Federalist, must be regarded as the liberty which the advocate usually thinks himself entitled to take with his subject. He gives, however, it appears to us, a definition which covers the question before us. A tax upon one's whole income is a tax upon the annual receipts from his whole property, and as such falls within the same class as a tax upon that property, and is a direct tax, in the meaning of the Constitution. And Mr. Hamilton in his report on the public credit, in referring to contracts with citizens of a foreign country, said : " This principle, which seems critically correct,

would exempt as well the income as the capital of the property. It protects the use, as effectually as the thing.   What, in fact, is property, but a fiction, without the beneficial use of it? In many cases, indeed, the *income* or *annuity* is the property itself."   3 Hamilton's Works, 34.

We think there is nothing in the *Hylton case* in conflict with the foregoing.   The case is badly reported.   The report does not give the names of both the judges before whom the case was argued in the Circuit Court.   The record of that court shows that Mr. Justice Wilson was one and District Judge Griffin of Virginia was the other.   Judge Tucker in his appendix to the edition of Blackstone published in 1803, (Tucker's Blackstone, vol. 1, part 1, p. 294,) says: "The question was tried in this State, in the case of *United States* v. *Hylton*, and the court being divided in opinion, was carried to the Supreme Court of the United States by consent.   It was there argued by the proposer of it, (the first Secretary of the Treasury,) on behalf of the United States, and by the present Chief Justice of the United States, on behalf of the defendant.   Each of those gentlemen was supposed to have defended his own private opinion.   That of the Secretary of the Treasury prevailed, and the tax was afterwards submitted to, universally, in Virginia."

We are not informed whether Mr. Marshall participated in the two days' hearing at Richmond, and there is nothing of record to indicate that he appeared in the case in this court; but it is quite probable that Judge Tucker was aware of the opinion which he entertained in regard to the matter.

Mr. Hamilton's argument is left out of the report, and in place of it it is said that the argument turned entirely upon the point whether the tax was a direct tax, while his brief shows that, so far as he was concerned, it turned upon the point whether it was an excise, and therefore not a direct tax.

Mr. Justice Chase thought that the tax was a tax on expense, because a carriage was a consumable commodity, and in that view the tax on it was on the expense of the owner. He expressly declined to give an opinion as to what were the

direct taxes contemplated by the Constitution.  Mr. Justice Paterson said: "All taxes on expenses or consumption are indirect taxes; a tax on carriages is of this kind."  He quoted copiously from Adam Smith in support of his conclusions, although it is now asserted that the justices made small account of that writer.  Mr. Justice Iredell said: "There is no necessity, or propriety, in determining what is or is not, a direct, or indirect, tax, in all cases.  It is sufficient, on the present occasion, for the court to be satisfied, that this is not a direct tax contemplated by the Constitution."

What was decided in the *Hylton case* was, then, that a tax on carriages was an excise, and, therefore, an indirect tax. The contention of Mr. Madison in the House was only so far disturbed by it, that the court classified it where he himself would have held it constitutional, and he subsequently as President approved a similar act.  3 Stat. 40.  The contention of Mr. Hamilton in the Federalist was not disturbed by it in the least.  In our judgment, the construction given to the Constitution by the authors of the Federalist (the five numbers contributed by Chief Justice Jay related to the danger from foreign force and influence, and to the treaty-making power) should not and cannot be disregarded.

The Constitution prohibits any direct tax, unless in proportion to numbers as ascertained by the census; and, in the light of the circumstances to which we have referred, is it not an evasion of that prohibition to hold that a general unapportioned tax, imposed upon all property owners as a body for or in respect of their property, is not direct, in the meaning of the Constitution, because confined to the income therefrom?

Whatever the speculative views of political economists or revenue reformers may be, can it be properly held that the Constitution, taken in its plain and obvious sense, and with due regard to the circumstances attending the formation of the government, authorizes a general unapportioned tax on the products of the farm and the rents of real estate, although imposed merely because of ownership and with no possible means of escape from payment, as belonging to a

totally different class from that which includes the property from whence the income proceeds?

There can be but one answer, unless the constitutional restriction is to be treated as utterly illusory and futile, and the object of its framers defeated. We find it impossible to hold that a fundamental requisition, deemed so important as to be enforced by two provisions, one affirmative and one negative, can be refined away by forced distinctions between that which gives value to property, and the property itself.

Nor can we perceive any ground why the same reasoning does not apply to capital in personalty held for the purpose of income or ordinarily yielding income, and to the income therefrom. All the real estate of the country, and all its invested personal property, are open to the direct operation of the taxing power if an apportionment be made according to the Constitution. The Constitution does not say that no direct tax shall be laid by apportionment on any other property than land; on the contrary, it forbids all unapportioned direct taxes; and we know of no warrant for excepting personal property from the exercise of the power, or any reason why an apportioned direct tax cannot be laid and assessed, as Mr. Gallatin said in his report when Secretary of the Treasury in 1812, "upon the same objects of taxation on which the direct taxes levied under the authority of the State are laid and assessed."

Personal property of some kind is of general distribution; and so are incomes, though the taxable range thereof might be narrowed through large exemptions.

The Congress of the Confederation found the limitation of the sources of the contributions of the States to "land, and the buildings and improvements thereon," by the eighth article of July 9, 1778, so objectionable that the article was amended April 28, 1783, so that the taxation should be apportioned in proportion to the whole number of white and other free citizens and inhabitants, including those bound to servitude for a term of years and three-fifths of all other persons, except Indians not paying taxes; and Madison, Ellsworth, and Hamilton in their address, in sending the amend-

ment to the States, said: "This rule, although not free from objections, is liable to fewer than any other that could be devised."   1 Ell. Deb. 93, 95, 98.

Nor are we impressed with the contention that, because in the four instances in which the power of direct taxation has been exercised, Congress did not see fit, for reasons of expediency, to levy a tax upon personalty, this amounts to such a practical construction of the Constitution that the power did not exist, that we must regard ourselves bound by it.   We should regret to be compelled to hold the powers of the general government thus restricted, and certainly cannot accede to the idea that the Constitution has become weakened by a particular course of inaction under it.

The stress of the argument is thrown, however, on the assertion that an income tax is not a property tax at all; that it is not a real estate tax, or a crop tax, or a bond tax; that it is an assessment upon the taxpayer on account of his money-spending power as shown by his revenue for the year preceding the assessment; that rents received, crops harvested, interest collected, have lost all connection with their origin, and although once not taxable have become transmuted in their new form into taxable subject-matter; in other words, that income is taxable irrespective of the source from whence it is derived.

This was the view entertained by Mr. Pitt, as expressed in his celebrated speech on introducing his income tax law of 1799, and he did not hesitate to carry it to its logical conclusion.   The English loan acts provided that the public dividends should be paid "free of all taxes and charges whatsoever;" but Mr. Pitt successfully contended that the dividends for the purposes of the income tax were to be considered simply in relation to the recipient as so much income, and that the fund holder had no reason to complain.   And this, said Mr. Gladstone, fifty-five years after, was the rational construction of the pledge.   Financial Statements, 32.

The dissenting justices proceeded in effect upon this ground in *Weston* v. *Charleston*, 2 Pet. 449, but the court rejected it. That was a state tax, it is true; but the States have power to

lay income taxes, and if the source is not open to inquiry, constitutional safeguards might be easily eluded.

We have unanimously held in this case that, so far as this law operates on the receipts from municipal bonds, it cannot be sustained, because it is a tax on the power of the States, and on their instrumentalities to borrow money, and consequently repugnant to the Constitution. But if, as contended, the interest when received has become merely money in the recipient's pocket, and taxable as such without reference to the source from which it came, the question is immaterial whether it could have been originally taxed at all or not. This was admitted by the Attorney General with character-istic candor ; and it follows that, if the revenue derived from municipal bonds cannot be taxed because the source cannot be, the same rule applies to revenue from any other source not subject to the tax ; and the lack of power to levy any but an apportioned tax on real and personal property equally exists as to the revenue therefrom.

Admitting that this act taxes the income of property irre-spective of its source, still we cannot doubt that such a tax is necessarily a direct tax in the meaning of the Constitution.

In England, we do not understand that an income tax has ever been regarded as other than a direct tax. In Dowell's History of Taxation and Taxes in England, admitted to be the leading authority, the evolution of taxation in that country is given, and an income tax is invariably classified as a direct tax. 3 Dowell, (1884,) 103, 126. The author refers to the grant of a fifteenth and tenth and a graduated income tax in 1435, and to many subsequent comparatively ancient statutes as income tax laws. 1 Dowell, 121. It is objected that the taxes imposed by these acts were not, scientifically speaking, income taxes at all, and that although there was a partial income tax in 1758, there was no general income tax until Pitt's of 1799. Nevertheless, the income taxes levied by these modern acts, Pitt's, Addington's, Petty's, Peel's, and by existing laws, are all classified as direct taxes ; and, so far as the income tax we are considering is concerned, that view is concurred in by the cyclopædists, the lexicographers, and

the political economists, and generally by the classification of European governments wherever an income tax obtains.

In *Attorney General* v. *Queen Insurance Co.*, 3 App. Cas. 1090, which arose under the British North America act of 1867, (30 and 31 Vict. c. 3, § 92,) which provided that the provincial legislatures could only raise revenue for provincial purposes within each province, (in addition to licenses,) by direct taxation, an act of the Quebec legislature laying a stamp duty came under consideration, and the judicial committee of the Privy Council, speaking by Jessel, M. R., held that the words "direct taxation" had "either a technical meaning, or a general, or, as it is sometimes called, a popular meaning. One or the other meaning the words must have; and in trying to find out their meaning we must have recourse to the usual sources of information, whether regarded as technical words, words of art, or words used in popular language." And considering "their meaning either as words used in the sense of political economy, or as words used in jurisprudence of the courts of law," it was concluded that stamps were not included in the category of direct taxation, and that the imposition was not warranted.

In *Attorney General* v. *Reed*, 10 App. Cas. 141, 144, Lord Chancellor Selbourne said, in relation to the same act of Parliament: "The question whether it is a direct or an indirect tax cannot depend upon those special events which may vary in particular cases; but the best general rule is to look to the time of payment; and if at the time the ultimate incidence is uncertain, then, as it appears to their lordships, it cannot, in this view, be called direct taxation within the meaning of the second section of the ninety-second clause of the act in question."

In *Bank of Toronto* v. *Lambe*, 12 App. Cas. 575, 582, the Privy Council, discussing the same subject, in dealing with the argument much pressed at the bar, that a tax to be strictly direct must be general, said that they had no hesitation in rejecting it for legal purposes. "It would deny the character of a direct tax to the income tax of this country, which is always spoken of as such, and is generally looked upon as a

direct tax of the most obvious kind; and it would run counter to the common understanding of men on this subject, which is one main clue to the meaning of the legislature."

At the time the Constitution was framed and adopted, under the systems of direct taxation of many of the States, taxes were laid on incomes from professions, business, or employments, as well as from "offices and places of profit;" but if it were the fact that there had then been no income tax law, such as this, it would not be of controlling importance. A direct tax cannot be taken out of the constitutional rule because the particular tax did not exist at the time the rule was prescribed. As Chief Justice Marshall said in the *Dartmouth College case:* "It is not enough to say, that this particular case was not in the mind of the convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go further, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception. The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the Constitution in making it an exception." 4 Wheat. 518, 644.

Being direct, and therefore to be laid by apportionment, is there any real difficulty in doing so? Cannot Congress, if the necessity exist of raising thirty, forty, or any other number of million dollars for the support of the government, in addition to the revenue from duties, imposts, and excises, apportion the quota of each State upon the basis of the census, and thus advise it of the payment which must be made, and proceed to assess that amount on all the real and personal property and the income of all persons in the State, and collect the same if the State does not in the meantime assume and pay its quota and collect the amount according to its own system and in its own way? Cannot Congress do this, as respects either or all these subjects of taxation, and deal with each in such manner as might be deemed expedient, as indeed was done in the act of July 14, 1798, c. 75, 1 Stat. 597? Inconveniences might pos-

sibly attend the levy of an income tax, notwithstanding the listing of receipts, when adjusted, furnishes its own valuation; but that it is apportionable is hardly denied, although it is asserted that it would operate so unequally as to be undesirable.

In the disposition of the inquiry whether a general unapportioned tax on the income of real and personal property can be sustained, under the Constitution, it is apparent that the suggestion that the result of compliance with the fundamental law would lead to the abandonment of that method of taxation altogether, because of inequalities alleged to necessarily accompany its pursuit, could not be allowed to influence the conclusion; but the suggestion not unnaturally invites attention to the contention of appellants' counsel, that the want of uniformity and equality in this act is such as to invalidate it. Figures drawn from the census are given, showing that enormous assets of mutual insurance companies; of building associations; of mutual savings banks; large productive property of ecclesiastical organizations; are exempted, and it is claimed that the exemptions reach so many hundred millions that the rate of taxation would perhaps have been reduced one-half, if they had not been made. We are not dealing with the act from that point of view; but, assuming the data to be substantially reliable, if the sum desired to be raised had been apportioned, it may be doubted whether any State, which paid its quota and collected the amount by its own methods, would, or could under its constitution, have allowed a large part of the property alluded to to escape taxation. If so, a better measure of equality would have been attained than would be otherwise possible, since, according to the argument for the government, the rule of equality is not prescribed by the Constitution as to Federal taxation, and the observance of such a rule as inherent in all just taxation is purely a matter of legislative discretion.

Elaborate argument is made as to the efficacy and merits of an income tax in general, as on the one hand, equal and just, and on the other, elastic and certain; not that it is not open to abuse by such deductions and exemptions as might make taxation under it so wanting in uniformity and equality as in

substance to amount to deprivation of property without due process of law ; not that it is not open to fraud and evasion and is inquisitorial in its methods; but because it is preëminently a tax upon the rich, and enables the burden of taxes on consumption and of duties on imports to be sensibly diminished. And it is said that the United States as "the representative of an indivisible nationality, as a political sovereign equal in authority to any other on the face of the globe, adequate to all emergencies, foreign or domestic, and having at its command for offence and defence and for all governmental purposes all the resources of the nation," would be "but a maimed and crippled creation after all," unless it possesses the power to lay a tax on the income of real and personal property throughout the United States without apportionment.

The power to tax real and personal property and the income from both, there being an apportionment, is conceded ; that such a tax is a direct tax in the meaning of the Constitution has not been, and, in our judgment, cannot be successfully denied ; and yet we are thus invited to hesitate in the enforcement of the mandate of the Constitution, which prohibits Congress from laying a direct tax on the revenue from property of the citizen without regard to state lines, and in such manner that the States cannot intervene by payment in regulation of their own resources, lest a government of delegated powers should be found to be, not less powerful, but less absolute, than the imagination of the advocate had supposed.

We are not here concerned with the question whether an income tax be or be not desirable, nor whether such a tax would enable the government to diminish taxes on consumption and duties on imports, and to enter upon what may be believed to be a reform of its fiscal and commercial system.    Questions of that character belong to the controversies of political parties, and cannot be settled by judicial decision.    In these cases our province is to determine whether this income tax on the revenue from property does or does not belong to the class of direct taxes.    If it does, it is, being unapportioned, in violation of the Constitution, and we must so declare.

Differences have often occurred in this court — differences

exist now — but there has never been a time in its history when there has been a difference of opinion as to its duty to announce its deliberate conclusions unaffected by considerations not pertaining to the case in hand.

If it be true that the Constitution should have been so framed that a tax of this kind could be laid, the instrument defines the way for its amendment. In no part of it was greater sagacity displayed. Except that no State, without its consent, can be deprived of its equal suffrage in the Senate, the Constitution may be amended upon the concurrence of 'two-thirds of both houses, and the ratification of the legislatures or conventions of the several States, or through a Federal convention when applied for by the legislatures of two-thirds of the States, and upon like ratification. The ultimate sovereignty may be thus called into play by a slow and deliberate process, which gives time for mere hypothesis and opinion to exhaust themselves, and for the sober second thought of every part of the country to be asserted.

We have considered the act only in respect of the tax on income derived from real estate, and from invested personal property, and have not commented on so much of it as bears on gains or profits from business, privileges, or employments, in view of the instances in which taxation on business, privileges, or employments has assumed the guise of an excise tax and been sustained as such.

Being of opinion that so much of the sections of this law as lays a tax on income from real and personal property is invalid, we are brought to the question of the effect of that conclusion upon these sections as a whole.

It is elementary that the same statute may be in part constitutional and in part unconstitutional, and if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected. And in the case before us there is no question as to the validity of this act, except sections twenty-seven to thirty-seven, inclusive, which relate to the subject which has been under discussion; and as to them we think the rule laid down by Chief Justice Shaw in *Warren* v. *Charlestown,* 2 Gray, 84, is

applicable, that if the different parts "are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them." Or, as the point is put by Mr. Justice Matthews in *Poindexter* v. *Greenhow*, 114 U. S. 270, 304: "It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void, because unconstitutional; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see, and to declare, that the intention of the legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute, for the law intended by the legislature, one they may never have been willing by itself to enact." And again, as stated by the same eminent judge in *Spraigue* v. *Thompson*, 118 U. S. 90, 95, where it was urged that certain illegal exceptions in a section of a statute might be disregarded, but that the rest could stand: "The insuperable difficulty with the application of that principle of construction to the present instance is, that by rejecting the exceptions intended by the legislature of Georgia the statute is made to enact what confessedly the legislature never meant. It confers upon the statute a positive operation beyond the legislative intent, and beyond what any one can say it would have enacted in view of the illegality of the exceptions."

According to the census, the true valuation of real and personal property in the United States in 1890 was $65,037,091,-197, of which real estate with improvements thereon made up $39,544,544,333. Of course, from the latter must be deducted, in applying these sections, all unproductive property and all property whose net yield does not exceed four thousand dollars; but, even with such deductions, it is evident that the income from realty formed a vital part of the scheme for taxation em-

bodied therein.  If that be stricken out, and also the income from all invested personal property, bonds, stocks, investments of all kinds, it is obvious that by far the largest part of the anticipated revenue would be eliminated, and this would leave the burden of the tax to be borne by professions, trades, employments, or vocations; and in that way what was intended as a tax on capital would remain in substance a tax on occupations and labor.   We cannot believe that such was the intention of Congress.   We do not mean to say that an act laying by apportionment a direct tax on all real estate and personal property, or the income thereof, might not also lay excise taxes on business, privileges, employments, and vocations.  But this is not such an act; and the scheme must be considered as a whole.   Being invalid as to the greater part, and falling, as the tax would, if any part were held valid, in a direction which could not have been contemplated except in connection with the taxation considered as an entirety, we are constrained to conclude that sections twenty-seven to thirty-seven, inclusive, of the act, which became a law without the signature of the President on August 28, 1894, are wholly inoperative and void.

Our conclusions may, therefore, be summed up as follows:

*First.*  We adhere to the opinion already announced, that, taxes on real estate being indisputably direct taxes, taxes on the rents or income of real estate are equally direct taxes.

*Second.*  We are of opinion that taxes on personal property, or on the income of personal property, are likewise direct taxes.

*Third.*  The tax imposed by sections twenty-seven to thirty-seven, inclusive, of the act of 1894, so far as it falls on the income of real estate and of personal property, being a direct tax within the meaning of the Constitution, and, therefore, unconstitutional and void because not apportioned according to representation, all those sections, constituting one entire scheme of taxation, are necessarily invalid.

*The decrees hereinbefore entered in this court will be vacated ; the decrees below will be reversed, and the cases remanded, with instructions to grant the relief prayed.*

MR. JUSTICE HARLAN dissenting.

At the former hearing of these causes it was adjudged that, within the meaning of the Constitution, a duty on incomes arising from rents was a direct tax on the lands from which such rents were derived, and, therefore, must be apportioned among the several States on the basis of population, and not by the rule of uniformity thoroughout the United States, as prescribed in the case of duties, imposts, and excises.   And the court, eight of its members being present, was equally divided upon the question whether *all* the other provisions of the statute relating to incomes would fall in consequence of that judgment.

It is appropriate now to say that however objectionable the law would have been, after the provision for taxing incomes arising from rents was stricken out, I did not then, nor do I now, think it within the province of the court to annul the provisions relating to incomes derived from other specified sources, and take from the government the entire revenue contemplated to be raised by the taxation of incomes, simply because the clause relating to rents was held to be unconstitutional.   The reasons for this view will be stated in another connection.

From the judgment heretofore rendered I dissented, announcing my entire concurrence in the views expressed by Mr. Justice White in his very able opinion.   I stated at that time some general conclusions reached by me upon the several questions covered by the opinion of the majority.

In dissenting from the opinion and judgment of the court on the present application for a rehearing, I alluded to particular questions discussed by the majority, and stated that in a dissenting opinion to be subsequently filed I would express my views more fully than I could then do as to what, within the meaning of the Constitution, and looking at the practice of the government, as well as the decisions of this court, was a "direct" tax to be levied only by apportioning it among the States according to their respective numbers.

By section 27 of the act of August 28, 1894, known as the

Wilson Tariff act, and entitled "An act to reduce taxation, to provide revenue for the government, and for other purposes," it was provided : "That from and after the first day of January eighteen hundred and ninety-five, and until the first day of January nineteen hundred, there shall be assessed, levied, collected, and paid annually upon the gains, profits, and income received in the preceding calendar year by every citizen of the United States, whether residing at home or abroad, and every person residing therein, whether said gains, profits, or income be derived from any kind of property, rents, interest, dividends, or salaries, or from any profession, trade, employment, or vocation carried on in the United States or elsewhere, or from any other source whatever, a tax of two per centum on the amount so derived over and above four thousand dollars, and a like tax shall be levied, collected, and paid annually upon the gains, profits, and income from all property owned and of every business, trade, or profession carried on in the United States by persons residing without the United States."

Section 28 declares what shall be included and what excluded in estimating the gains, profits, and income of any person.

The Constitution declares that "the Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States ; but all duties, imposts and excises shall be uniform throughout the United States." Art. I, Sec. 8.

The only other clauses in the Constitution, at the time of its adoption, relating to taxation by the general government, were the following :

"Representatives and direct taxes shall be apportioned among the several States which may be included within this Union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons. The actual enumeration shall be made within three years after the first meeting of the Congress of the United States, and

within every. subsequent term of ten years, in such manner as they shall by law direct." Art. I, Sec. 2.

"No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken." Art. I, Sec. 9.

"No tax or duty shall be laid on articles exported from any State." Art. I, Sec. 9.

The Fourteenth Amendment provides that "representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."

It thus appears that the primary object of all taxation by the general government is to pay the debts and provide for the common defence and general welfare of the United States, and that with the exception of the inhibition upon taxes or duties on articles exported from the States, no restriction is in terms imposed upon national taxation, except that direct taxes must be apportioned among the several States on the basis of numbers, (excluding Indians not taxed,) while duties, imposts and excises must be uniform throughout the United States.

What are "direct taxes" within the meaning of the Constitution? In the convention of 1787, Rufus King asked what was the precise meaning of *direct* taxation, and no one answered. Madison Papers, 5 Elliott's Debates, 451. The debates of that famous body do not show that any delegate attempted to give a clear, succinct definition of what, in his opinion, was a direct tax. Indeed, the report of those debates, upon the question now before us, is very meagre and unsatisfactory. An illustration of this is found in the case of Gouverneur Morris. It is stated that on the 12th of July, 1787, he moved to add to a clause empowering Congress to vary representation according to the principles of "wealth and numbers of inhabitants," a proviso "that taxation shall be in proportion to representation." And he is reported to have remarked, on that occasion, that while some objections lay against his motion, he supposed "they would be removed by restraining the rule to *direct* taxation." 5 Elliott's Debates, 302. But, on the 8th of August, 1787, the work of the Committee on Detail being before

the convention, Mr. Morris is reported to have remarked, "let it not be said that direct taxation is to be proportioned to representation."    5 Elliott's Debates, 393.

If the question propounded by Rufus King had been answered in accordance with the interpretation now given, it is not at all certain that the Constitution, in its present form, would have been adopted by the convention, nor, if adopted, that it would have been accepted by the requisite number of States.

A question so difficult to be answered by able statesmen and lawyers directly concerned in the organization of the present government, can now, it seems, be easily answered, after a reëxamination of documents, writings, and treatises on political economy, all of which, without any exception worth noting, have been several times directly brought to the attention of this court.   And whenever that has been done the result always, until now, has been that a duty on incomes, derived from taxable subjects, of whatever nature, was held not to be a direct tax within the meaning of the Constitution, to be apportioned among the States on the basis of population, but could be laid, according to the rule of uniformity, upon individual citizens, corporations, and associations without reference to numbers in the particular States in which such citizens, corporations, or associations were domiciled.   Hamilton, referring to the distinction between direct and indirect taxes, said it was "a matter of regret that terms so uncertain and vague in so important a point are to be found in the Constitution," and that it would be vain to seek "*for any antecedent settled legal meaning to the respective terms.*"    7 Hamilton's Works, (orig. ed.,) 845.

This court is again urged to consider this question in the light of the theories advanced by political economists.    But Chief Justice Chase, delivering the judgment of this court in *Veazie Bank* v. *Fenno*, 8 Wall. 533, 542, observed that the enumeration of the different kinds of taxes that Congress was authorized to impose was probably made with very little reference to the speculations of political economists, and that there was nothing in the great work of Adam Smith, published shortly before the meeting of the convention of 1787, that

gave any light on the meaning of the words " direct taxes " in the Constitution.

From the very necessity of the case, therefore, we are compelled to look at the practice of the government after the adoption of the Constitution as well as to the course of judicial decision.

By an act of Congress, passed June 5, 1794, c. 45, 1 Stat. 373, specified duties were laid " upon all carriages for the conveyance of persons," that should be kept by or for any person for his use, or to be let out to hire, or for the conveying of passengers.   The case of *Hylton* v. *United States*, 3 Dall. 171, decided in 1796, distinctly presented the question whether the duties laid upon carriages by that act was a direct tax within the meaning of the Constitution.   If it was a tax of that character, it was conceded that the statute was unconstitutional, for the reason that the duties imposed by it were not apportioned among the States on the basis of numbers.   As the case involved an important constitutional question, each of the Justices who heard the argument delivered a separate opinion. Chief Justice Ellsworth was sworn into office on the day the decision was announced, but, not having heard the whole of the argument, declined to take any part in the judgment.   It can scarcely be doubted that he approved the decision; for, while a Senator in Congress from Connecticut, he voted more than once for a bill laying duties on carriages, and, with Rufus King, Robert Morris, and other distinguished statesmen, voted in the Senate for the act of June 5, 1794.   Annals of Congress, 3d Sess., 1793–5, pp. 120, 849.

It is well to see what the Justices who delivered opinions in the *Hylton case* said as to the meaning of the words " direct taxes " in the Constitution.

Mr. Justice Chase said: " As it was incumbent on the plaintiff's counsel in error, so they took great pains to prove that the tax on carriages was a direct tax; but they did not satisfy my mind.   I think at least it may be doubted, and if I only doubted I should affirm the judgment of the Circuit Court.   The deliberate decision of the national legislature (who did not consider a tax on carriages a direct tax, but

thought it was within the description of a duty) would determine me, if the case was doubtful, to receive the construction of the legislature.   But I am inclined to think that a tax on carriages is not a direct tax, within the letter or meaning of the Constitution.   The great object of the Constitution was to give Congress a power to lay taxes adequate to the exigencies of government; but they were to observe two rules in imposing them, namely, the rule of uniformity, when they laid duties, imposts, or excises, and the rule of apportionment according to the census, when they laid any direct tax." "The Constitution evidently contemplated no taxes as direct taxes, but only such as Congress could lay in proportion to the *census.*   The rule of apportionment is only to be adopted in such cases where it can reasonably apply; and the subject taxed must ever determine the application of the rule.   If it is proposed to tax any specific article by the rule of apportionment, and it would evidently create great inequality and injustice, it is unreasonable to say that the Constitution intended such tax should be laid by that rule.   It appears to me that a tax on carriages cannot be laid by the rule of apportionment without very great inequality and injustice. For example, suppose two States, equal in census, to pay $80,000 each, by a tax on carriages of eight dollars on every carriage; and in one State there are 100 carriages and in the other 1000.   The owners of carriages in one State would pay ten times the tax of owners in the other.   A in one State would pay for his carriage eight dollars, but B, in the other State, would pay for his carriage eighty dollars." "I think an annual tax on carriages for the conveyance of persons may be considered as within the power granted to Congress to lay duties.   The term *duty* is the most comprehensive next to the general term *tax,* and practically in Great Britain (whence we take our general ideas of taxes, duties, imposts, excises, customs, etc.) embraces taxes on stamps, tolls for passage, etc., and is not confined to taxes on importation only." "I am inclined to think, but of this I do not give a judicial opinion, that the direct taxes contemplated by the Constitution are only two, to wit, a capitation or poll tax, simply, without

regard to property, profession, or any other circumstance, and a tax on land.  I doubt whether a tax, by a general assessment of personal property within the United States is included within the term 'direct tax.'"

Mr. Justice Paterson: "What is the natural and common or technical and appropriate meaning of the words 'duty' and 'excise,' it is not easy to ascertain.  They present no clear and precise idea to the mind.  Different persons will annex different significations to the terms.  It was, however, obviously the intention of the framers of the Constitution that Congress should possess full power over every species of taxable property, except exports.  The term 'taxes' is generical, and was made use of to vest in Congress plenary authority in all cases of taxation.  The general division of taxes is into direct and indirect.  Although the latter term is not to be found in the Constitution, yet the former necessarily implies it.  Indirect stands opposed to direct.  There may, perhaps, be an indirect tax on a particular article, that cannot be comprehended within the description of duties, or imposts, or excises; in such case it will be comprised under the general denomination of taxes; for the term 'tax' is the *genus*, and includes: 1. Direct taxes.  2. Duties, imposts, and excises.  3. All other classes of an indirect kind, and not within any of the classifications enumerated under the preceding heads.  The question occurs, how is such tax to be laid, uniformly or apportionately?  The rule of uniformity will apply, because it is an indirect tax, and direct taxes only are to be apportioned. What are direct taxes within the meaning of the Constitution?  The Constitution declares that a capitation tax is a direct tax, and, both in theory and practice, a tax on land is deemed to be a direct tax.  In this way the terms direct taxes and capitation and other direct tax are satisfied."  "I never entertained a doubt that the principal, I will not say the only, objects that the framers of the Constitution contemplated as falling within the rule of apportionment were a capitation tax and a tax on land.  Local considerations and the particular circumstances and relative situation of the States naturally lead to this view of the subject.  The provision was made

in favor of the Southern States. They possessed a large number of slaves; they had extensive tracts of territory, thinly settled and not very productive. A majority of the States had but few slaves, and several of them a limited territory, well settled, and in a high state of cultivation. The Southern States, if no provision had been introduced in the Constitution, would have been wholly at the mercy of the other States. Congress, in such case, might tax slaves, at discretion or arbitrarily, and land in every part of the Union after the same rate or measure: so much a head in the first instance, and so much an acre in the second. To guard them against imposition in these particulars was the reason of introducing the clause in the Constitution, which directs that representatives and direct taxes shall be apportioned among the States according to their respective numbers. On the part of the plaintiff in error it has been contended that the rule of apportionment is to be favored rather than the rule of uniformity, and, of course, that the instrument is to receive such a construction as will extend the former and restrict the latter. I am not of that opinion. The Constitution has been considered as an accommodating system; it was the effect of mutual sacrifices and concessions; it was the work of compromise. The rule of apportionment is of this nature; it is radically wrong; it cannot be supported by any solid reasoning. Why should slaves, who are a species of property, be represented more than any other property? The rule, therefore, ought not to be extended by construction. Again, numbers do not afford a just estimate or rule of wealth. It is, indeed, a very uncertain and incompetent sign of opulence." "If a tax upon land, where the object is simple and uniform throughout the States, is scarcely practicable, what shall we say of a tax attempted to be apportioned among, and raised and collected from, a number of dissimilar objects? The difficulty will increase with the number and variety of the things proposed for taxation. We shall be obliged to resort to intricate and endless valuations and assessments, in which everything will be arbitrary and nothing certain. There will be no rule to walk by. The rule of uniformity, on the con-

trary, implies certainty, and leaves nothing to the will and pleasure of the assessor. In such case, the object and the sum coincide, the rule and thing unite, and of course there can be no imposition. The truth is, that the articles taxed in one State should be taxed in another; in this way the spirit of jealousy is appeased, and tranquillity preserved; in this way the pressure on industry will be equal in the several States, and the relation between the different objects of taxation duly preserved. Apportionment is an operation on States, and involves valuations and assessments, which are arbitrary, and should not be resorted to but in case of necessity. Uniformity is an instant operation on individuals, without the intervention of assessments, or any regard to States, and is at once easy, certain, and efficacious. All taxes on expenses or consumption are indirect taxes."

Mr. Justice Iredell: "1. All direct taxes must be apportioned. 2. All duties, imposts, and excises must be uniform. If the carriage tax be a direct tax, within the meaning of the Constitution, it must be apportioned. If it be a duty, impost, or excise, within the meaning of the Constitution, it must be uniform. If it can be considered as a tax, neither direct within the meaning of the Constitution, nor comprehended within the term 'duty, impost, or excise' there is no provision in the Constitution, one way or another, and then it must be left to such an operation of the power, as if the authority to lay taxes had been given generally in all instances, without saying whether they should be apportioned or uniform; and in that case I should presume the tax ought to be uniform, because the present Constitution was particularly intended to affect individuals, and not States, except in particular cases specified; and this is the leading distinction between the articles of Confederation and the present Constitution. As all direct taxes must be apportioned, it is evident that the Constitution contemplated none as direct but such as could be apportioned. If this cannot be apportioned, it is, therefore, not a direct tax in the sense of the Constitution. That this tax cannot be apportioned is evident." "Such an arbitrary method of taxing different States differently is a suggestion

altogether new, and would lead, if practised, to such danger-
ous consequences, that it will require very powerful arguments
to show that that method of taxing would be in any manner
compatible with the Constitution, with which at present I
deem it utterly irreconcilable, it being altogether destructive
of the notion of a common interest, upon which the very
principles of the Constitution are founded, so far as the con-
dition of the United States will admit." "Some difficulties
may occur which we do not at present foresee.   Perhaps a
direct tax in the sense of the Constitution can mean nothing
but a tax on something inseparably annexed to the soil; some-
thing capable of apportionment under all such circumstances."
"It is sufficient, on the present occasion, for the court to be
satisfied that this is not a direct tax contemplated by the
Constitution, in order to affirm the present judgment; since,
if it cannot be apportioned, it must necessarily be uniform.
I am clearly of opinion this is not a direct tax in the sense of
the Constitution, and, therefore, that the judgment ought to
be affirmed."

Mr. Justice Wilson: "As there were only four judges, in-
cluding myself, who attended the argument of this cause, I
should have thought it proper to join in the decision, though
I had before expressed a judicial opinion on the subject, in the
Circuit Court of Virginia, did not the unanimity of the other
three judges relieve me from the necessity.   I shall now, how-
ever, only add, that my sentiments, in favor of the constitu-
tionality of the tax in question, have not been changed."

The scope of the decision in the *Hylton case* will appear
from what this court has said in later cases to which I will
hereafter refer.

It is appropriate to observe, in this connection, that the
importance of the *Hylton case* was not overlooked by the
statesmen of that day.   It was argued by eminent lawyers,
and we may well assume that nothing was left unsaid that
was necessary to a full understanding of the question involved.
Edmund Pendleton, of Virginia, concurring with Madison
that a tax on carriages was a direct tax, within the mean-
ing of the Constitution, prepared a paper on the subject, and

enclosed it to Mr. Giles, then a Senator from Virginia. Under date of February 7, 1796, Madison wrote to Pendleton: "I read with real pleasure the paper you put into the hands of Mr. Giles, which is unquestionably a most simple and lucid view of the subject, and well deserving the attention of the court which is to determine on it. The paper will be printed in the newspapers, *in time for the judges to have the benefit of it.* I did not find that it needed any of those corrections which you so liberally committed to my hand. It has been thought unnecessary to prefix your name; but Mr. Giles will let *an intimation* appear, along with the remarks, that they proceed *from a quarter that claims attention to them.* . . . There never was a question on which my mind was more satisfied, and yet I have very little expectation that it will be viewed by the court in the same light it is by me." 2 Madison's Writings, 77. And on March 6, 1796, two days before the *Hylton case* was decided, Madison wrote to Jefferson: "The court has not given judgment yet on the carriage tax. It is said the Judges will be unanimous for its constitutionality." 2 Madison's Writings, 87. Mr. Justice Iredell, in his Diary, said: "At this term Oliver Ellsworth took his seat as Chief Justice. The first case that came up was that of *Hylton* v. *The United States.* This was a very important cause, as it involved a question of constitutional law. The point was the constitutionality of the law of Congress of 1794, laying *duties* upon carriages. If a *direct tax,* it could only be laid in proportion to the census, which has not as yet been taken. The counsel of Hylton, Campbell and Ingersoll, contended that the tax was a *direct tax,* and were opposed by Lee and Hamilton. The court *unanimously* agreed that the tax was constitutional, and delivered their opinions 'seriatim.'" Again: "The day before yesterday Mr. Hamilton spoke in our court, attended by the most crowded audience I ever saw there, both Houses of Congress being almost deserted on the occasion. Though he was in very ill health, he spoke with astonishing ability and in a most pleasing manner, and was listened to with the profoundest attention. His speech lasted about three hours. It was on the question whether the car-

riage tax, as laid, was a constitutional one."[1]   2 McRee's Life of Iredell, 459, 461.

Turning now to the acts of Congress passed after the decision in the *Hylton case,* we find that by the acts of July 14, 1798, c. 75, 1 Stat. 597; August 2, 1813, c. 37, 3 Stat. 53; January 9, 1815, c. 21, 3 Stat. 164; and March 5, 1816, c. 24, 3 Stat. 255, *direct* taxes were assessed upon *lands, improvements, dwelling-houses,* and *slaves,* and apportioned among the several States.   And by the act of August 5, 1861, c. 45, 12 Stat. 294, 297, entitled " An act to provide increased revenues from imports, to pay interest on the debt, and for other purposes," a *direct* tax was assessed and apportioned among the States on *lands, improvements,* and *dwelling-houses* only.

Instances of duties upon tangible personal property are found in the act of January 18, 1815, c. 22, 3 Stat. 180, imposing duties upon certain goods, wares, and merchandise, manufactured or made for sale within the United States or the Territories thereof, namely, upon pig iron, castings of iron, bar iron, rolled or slit iron, nails, brads or sprigs, candles of white wax, mould candles of tallow, hats, caps, umbrellas and parasols, paper, playing and visiting cards, saddles, bridles, books, beer, ale, porter, and tobacco ; and also in the act of January 18, 1815, c. 23, 3 Stat. 186, which laid a duty graduated by value upon " all household furniture kept for use," and upon gold and silver watches.

It may be observed, in passing, that the above statutes, with one exception, were all enacted during the administration of President Madison, and were approved by him.

Instances of duties upon intangible personal property are afforded by the Stamp Act of July 6, 1797, c. 11, 1 Stat. 527, which, among other things, levied stamp duties upon bonds, notes, and certificates of stock.   Similar duties had been made familiar to the American people by the British Stamp Act of 1765, 5 Geo. 3, c. 12, 26 Pickering's Statutes at Large, 179, and were understood by the delegates to the Convention of 1787 to be included among the duties mentioned in the Constitution.   1 Elliott's Deb. 368 ; 5 Id. 432.

The reason slaves were included in the earlier acts as proper

subjects of direct taxation is thus explained by this court in Veazie Bank v. Fenno, above cited: "As persons, slaves were proper subjects of a capitation tax, which is described in the Constitution as a direct tax; as property they were, by the laws of some, if not most of the States, classed as real property, descendible to heirs. Under the first view, they would be subject to the tax of 1798, as a capitation tax; under the latter, they would be subject to the taxation of the other years as realty. That the latter view was that taken by the framers of the acts after 1798, becomes highly probable, when it is considered that in the States where slaves were held, much of the value which would otherwise have attached to land passed into the slaves. If, indeed, the land only had been valued without the slaves, the land would have been subject to much heavier proportional imposition in those States than in States where there were no slaves; for the proportion of tax imposed on each State was determined by population, without reference to the subjects on which it was to be assessed. The fact, then, that slaves were valued, under the act referred to, far from showing, as some have supposed, that Congress regarded personal property as a proper object of direct taxation under the Constitution, shows only that Congress, after 1798, regarded slaves, for the purpose of taxation, as realty." 8 Wall. 543.

Recurring to the course of legislation it will be found that, by the above act of August 5, 1861, c. 45, Congress not only laid and apportioned among the States a direct tax of $20,000,000 upon lands, improvements, and dwelling-houses, but it provided that there should be "levied, collected, and paid upon the annual *income* of every person residing in the United States, whether such income is derived *from any kind of property*, or from any profession, trade, employment, or vocation carried on in the United States or elsewhere, *or from any source whatever*, if such annual income exceeds the sum of eight hundred dollars, a tax of three per centum on the amount of such excess of each income above eight hundred dollars," etc. 12 Stat. 292, 309.

Subsequent statutes greatly extended the area of taxation. By the act of July 1, 1862, c. 119, a duty was imposed on

the gross amount of all receipts for the transportation of passengers by railroads, steam vessels, and ferry boats; on all dividends in scrip or money declared due or paid by banks, trust companies, insurance companies, and upon "the annual gains, profits, or income of every person residing in the United States, whether derived *from any kind of property, rents,* interest, dividends, salaries, or from any profession, trade, employment, or vocation carried on in the United States or elsewhere, *or from any source whatever,*" etc. 12 Stat. 432, 473. The act of June 30, 1864, c. 173, as did the previous act of 1862, imposed a duty on gains, profits, or income from whatever kind of property or from whatever source derived, including "rents." 13 Stat. 223, 281. The act of March 3, 1865, c. 78, increased the amount of such duty. 13 Stat. 479. All subsequent acts of Congress retained the provision imposing a duty on income derived from rents and from every kind of property. Act of March 10, 1866, c. 15, 14 Stat. 4, 5; act of March 2, 1867, c. 169, 14 Stat. 471, 477, 480; act of July 14, 1870, c. 255, 16 Stat. 256.

What has been the course of judicial decision touching the clause of the Constitution that relates to direct taxes? And, particularly, what, in the opinion of this court, was the scope and effect of the decision in *Hylton* v. *United States?*

In *Pacific Ins. Co.* v. *Soule,* 7 Wall. 433, 446, the question was presented whether the duty imposed by the act of June 30, 1864, as amended by that of July 13, 1866, on the dividends and undistributed sums, that is, on the incomes, from whatever source, of insurance companies, was a direct tax that could only be laid by apportionment among the States. The point was distinctly made in argument that "an income tax is, and always heretofore has been, regarded as being a direct tax, as much so as a poll tax or a land tax. If it be a direct tax, then the Constitution is imperative that it shall be apportioned." Mr. Justice Swayne, delivering the unanimous judgment of this court, said "what are *direct* taxes was elaborately argued and considered by this court in *Hylton* v. *United States,* decided in the year 1796. . . . The views expressed in this [that] case are adopted by Chancellor Kent and Justice

Story in their examination of the subject." "The taxing power is given in the most comprehensive terms.   The only limitations imposed are: That *direct* taxes, including the capitation tax, shall be apportioned; that duties, imposts, and excises shall be uniform; and that no duties shall be imposed upon articles exported from any State.   With these exceptions the exercise of the power is, in all respects, unfettered.   If a tax upon carriages, kept for his own use by the owner, is not a direct tax, we can see no ground upon which a tax upon the business of an insurance company can be held to belong to that class of revenue charges."   "The consequences which would follow the apportionment of the tax in question among the States and Territories of the Union, in the manner prescribed by the Constitution, must not be overlooked.   They are very obvious.   Where such corporations are numerous and rich, it might be light; where none exist, it could not be collected; where they are few and poor, it would fall upon them with such weight as to involve annihilation.   It cannot be supposed that the framers of the Constitution intended that any tax should be apportioned, the collection of which on that principle would be attended with such results. The consequences are fatal to the proposition.   To the question under consideration it must be answered that the tax to which it relates is not a direct tax, but a duty or excise; that it was obligatory on the plaintiff to pay it."

In *Veazie Bank* v. *Fenno*, 8 Wall. 533, 543, 544, 546, the principal question was whether a tax on state bank notes issued for circulation was a direct tax.   On behalf of the bank it was contended by distinguished counsel that the tax was a direct one, and that it was invalid because not apportioned among the States agreeably to the Constitution.   In explanation of the nature of direct taxes they relied largely (so the authorized report of the case states) on the writings of Adam Smith, and on other treatises, English and American, on political economy.   In the discussion of the case reference was made by counsel to the former decisions in *Hylton* v. *United States,* and *Pacific Ins. Co.* v. *Soule.*   Chief Justice Chase, delivering the judgment of the court, after observing (as I have

already stated) that the works of political economists gave no valuable light on the question as to what, in the *constitutional* sense, were direct taxes, entered upon an examination of the numerous acts of Congress imposing taxes. That examination, he announced on behalf of this court, showed "that *personal property*, contracts, occupations, and the like, have never been regarded by Congress as proper subjects of *direct* tax." "It may be rightly affirmed, therefore, that in the practical construction of the Constitution by Congress direct taxes have been limited to taxes on land and appurtenances, and taxes on polls, or capitation taxes. And this construction is entitled to great consideration, especially in the absence of anything adverse to it in the discussions of the convention which framed and of the conventions which ratified the Constitution." Referring to certain observations of Madison, King, and Ellsworth in the convention of 1787, he said: "All this doubtless shows uncertainty as to the true meaning of the term 'direct tax'; but it indicates, also, an understanding that direct taxes were such as may be levied by capitation, and on lands and appurtenances; or, perhaps, by valuation and assessment of personal property upon general lists. For these were the subjects from which the States at that time usually raised their principal supplies. This view received the sanction of this court two years before the enactment of the first law imposing direct taxes *eo nomine.*" The case last referred to was *Hylton* v. *United States.* After a careful examination of the opinions in that case, Chief Justice Chase proceeded: "It may be safely assumed, therefore, as the unanimous judgment of the court, [in the *Hylton case*] that a tax on carriages is not a direct tax. And it may further be taken as established upon the testimony of Paterson, that the words 'direct taxes,' as used in the Constitution, comprehended only capitation taxes, and taxes on land, and perhaps taxes on personal property by general valuation and assessment of the various descriptions possessed within the several States. It follows necessarily that *the power to tax without apportionment extends to all other objects. Taxes on other objects are included under the heads of taxes not direct, duties, imposts, and excises, and must*

*be laid and collected by the rule of uniformity.*  The tax under consideration is a tax on bank circulation, and may very well be classed under the head of duties.   Certainly it is not, in the sense of the Constitution, a direct tax.   It may be said to come within the same category of taxation as the tax on *incomes* of insurance companies, which this court, at the last term, in the case of *Pacific Insurance Company* v. `Soule, 7 .Wall. 433, held *not to be ,a direct tax.*"

In *Scholey* v. *Rew*, 23 Wall. 331, 346, 347, the question was, whether a duty laid by the act of June 30, 1864, as amended, 14 Stat. 140, 141, upon successions was a direct tax within the meaning of the Constitution of the United States.   The act provided that the duty shall be paid at the time when the successor, or any person in his right or on his behalf, shall become *entitled in possession* to his succession, or to the .receipt of the income and profits thereof.   The act further provided that "the term 'real estate' should in- clude 'all lands, tenements, and hereditaments, corporeal and incorporeal,' and that the term 'succession' should de- note, 'the *devolution of title* to any real estate.'"   Also: "That every past or future disposition of real estate by will, deed, or laws of descent, by reason whereof any person shall become beneficially entitled, in possession or expec- tancy, to any real estate, or the income thereof, upon the death of any person entitled by reason of any such dispo- sition, a 'succession;'" and that "the interest of any suc- cessor in moneys to arise from the sale of real estate, under any trust for the sale thereof, shall be deemed to be a succes- sion chargeable with duty under this act, and the said duty shall be paid by the trustee, executor, or other person having control of the funds."   It is important also to observe that this succession tax was made a *lien* on the land "in respect whereof" it was laid, and was to be "collected by the same officers, in the same manner, and by the same processes as direct taxes upon lands, under the authority of the United States."   A duty was also imposed by the same act on leg- acies and distributive shares of personal property.

It would seem that this case was one that involved directly

the meaning of the words "direct taxes" in the Constitution. In the argument of that case it was conceded by the counsel for the taxpayer that the opinions in the *Hylton case* recognized a tax on land and a capitation tax to be the *only direct* taxes contemplated by the Constitution. But counsel said: "The present is a tax *on land*, if ever one was. No doubt it is to be paid by the owner of the land, if he can be made to pay it; but that is true of any tax that ever was or ever can be imposed on property. And as if to prove how directly the property, and not the property owner, is aimed at, the duty is made a specific lien and charge upon the land 'in respect whereof' it is assessed. More than this: as if to show how identical, in the opinion of Congress, this duty was with the avowedly direct tax upon lands which it had levied but a year or two before, it enacts that this *succession tax alone*, out of a great revenue system, should be collected by the same officers, in the same manner, and by the same processes as direct taxes upon lands under the authority of the United States."

This interpretation of the Constitution was rejected by every member of this court. Mr. Justice Clifford, delivering the unanimous judgment of the court, said: "Support to the first objection is attempted to be drawn from that clause of the Constitution which provides that direct taxes shall be apportioned among the several States which may be included within the Union, according to their respective numbers; and also from the clause which provides that no capitation or other direct tax shall be laid unless in proportion to the census or amended enumeration; but it is clear that the tax or duty levied by the act under consideration is not a direct tax within the meaning of either of those provisions. Instead of that it is plainly an excise tax or duty, authorized by section eight of article one, which vests power in Congress to lay and collect taxes, duties, imposts, and excises to pay the debts and provide for the common defence and general welfare. Such a tax or duty is neither a tax on land nor a capitation exaction, as subsequently appears from the language of the section imposing the tax or duty, as well as from the preceding section, which provides that the term 'succession' shall denote the devolution

of real estate; and the section which imposes the tax or duty also contains a corresponding clause, which provides that the term 'successor' shall denote the person so entitled, and that the term 'predecessor' shall denote the grantor, testator, ancestor, or other person from whom the interest of the successor has been or shall be derived." Again : "Whether direct taxes, in the sense of the Constitution, comprehend any other tax than a capitation tax and a tax on land, is a question not absolutely decided, nor is it necessary to determine it in the present case, as it is expressly decided that the term *does not include* the tax *on income,* which cannot be distinguished in principle from a succession tax such as the one involved in the present controversy. *Insurance Co.* v. *Soule,* 7 Wall. 446 ; *Veazie Bank* v. *Fenno,* 8 Wall. 546 ; *Clark* v. *Sickel,* 14 Int. Rev. Rec. 6. Neither duties nor excises were regarded as direct taxes by the authors of The Federalist, No. 36, p. 161; Hamilton's Works, 847; *License Tax Cases,* 5 Wall. 462." "Exactions for the support of the government may assume the form of duties, imposts, or excises, or they may also assume the form of license fees for permission to carry on particular occupations or to enjoy special franchises, or they may be specific in form, as when levied upon corporations in reference to the amount of capital stock or to the business done or profits earned by the individual or corporation. Cooley Const. Lim. 495 * ; *Provident Institution* v. *Massachusetts,* 6 Wall. 611 ; *Bank* v. *Apthorp,* 12 Mass. 252. Sufficient appears in the prior suggestions to define the language employed and to point out what is the true intent and meaning of the provision, and to make it plain that the exaction is not a tax upon the land, and that it was rightfully levied, if the findings of the court show that the plaintiff became entitled, in the language of the section, or acquired the estate or the right to the income thereof by the devolution of the title to the same, as assumed by the United States."

The meaning of the words "direct taxes" was again the subject of consideration by this court in *Springer* v. *United States,* 102 U. S. 586, 599, 600, 602. A reference to the printed arguments in that case will show that this question was most

thoroughly examined, every member of the court participating in the decision.  The question presented was as to the constitutionality of the act of June 30, 1864, c. 172, 13 Stat. 218, as amended by the act of March 3, 1865, c. 78, 13 Stat. 469, so far as it levied a duty upon gains, profits, and income derived from every kind of property, and from every trade, profession, or employment.  The contention of Mr. Springer was, that such a tax was a direct tax that could not be levied except by apportioning the same among the States, on the basis of numbers.  In support of his position he cited numerous authorities, among them, all or most of the leading works on political economy and taxation.  Mr. Justice Swayne, again delivering the unanimous judgment of this court, referred to the proceedings and debates in the convention of 1787, to The Federalist, to all the acts of Congress imposing taxation, and to the previous cases of *Hylton* v. *United States, Pacific Ins. Co.* v. *Soule, Veazie Bank* v. *Fenno,* and *Scholey* v. *Rew.* Among other things he said: "It does not appear that any tax like the one here in question was ever regarded or treated by Congress as a direct tax.  This uniform practical construction of the Constitution touching so important a point, through so long a period, by the legislative and executive departments of the government, though not conclusive, is a consideration of great weight."  Alluding to the observations by one of the Judges in the *Hylton case* as to the evils of an apportioned tax on specific personal property, he said: "It was well held that where such evils would attend the apportionment of a tax, the Constitution could not have intended that an apportionment should be made.  This view applies with even greater force to the tax in question in this case.  Where the population is large and the incomes are few and small, *it would be intolerably oppressive.*"  After examining the cases above cited, he concludes, speaking for the entire court: " All these cases are undistinguishable in principle from the case now before us, and they are decisive against the plaintiff in error.  The question, what is a direct tax, is one exclusively in American jurisprudence.  The text-writers of the country are in entire accord upon the subject.  Mr. Justice Story says

that all taxes are usually divided into two classes — those which are *direct* and those which are *indirect* — and that 'under the .former denomination are included taxes on land or real property, and, under the latter, taxes on consumption.' 1 Story Const. § 950.   Chancellor Kent, speaking of the case of *Hylton* v. *United States*, says: 'The better opinion seems to be that the direct taxes contemplated by the Constitution. were only two, viz., a capitation or poll tax and a tax on land.'   1 Kent Com. 257.   See also Cooley, Taxation, p. 5, note 2; Pomeroy, Const. Law, 157, p. 230, 9th ed.; Sharwood's Blackstone, 308, note; Rawle, Const. 30; Sergeant, Const. 305. We are not aware that any writer, since *Hylton* v. *United States* was decided, has expressed a view of the subject different from that of these authors.   Our conclusions are, that *direct* taxes, within the meaning of the Constitution, are *only* capitation taxes, as expressed in that instrument, *and taxes on real estate*, and that the tax of which the plaintiff in error complains is within the category of an excise or duty."

One additional authority may be cited — *Clarke* v. *Sickel etc*, reported in 14 Int. Rev. Rec. 6, and referred to in the opinion of this court in *Scholey* v. *Rew*.   It was decided by Mr. Justice Strong at the circuit in 1871.   That case involved. the validity of a tax on income derived from an annuity bequeathed by the will of the plaintiff's husband, *and charged* (as the record of that case shows) *upon his entire estate, real and personal*.   The eminent jurist who decided the case said: "The pleadings in all those cases raise the question whether the act of Congress of June 30, 1864, c. 171, and its supplements, so far as they impose a tax upon the annual gains, profits, or income of every person residing in the United States, or of any citizen of the United States residing abroad, are within the power conferred by the Constitution upon Congress.   If it be true, as has been argued, that the income tax is a 'capitation or other direct tax' within the meaning of the Constitution, it is undoubtedly prohibited by the first and ninth sections of the first article, for it is not 'apportioned among the States.'   But I am of opinion that it is not a 'capitation or other direct tax' in the sense in which the

framers of the Constitution and the people of the States who adopted it understood such taxes." The significance of this language is manifest when the fact is recalled that the act of 1864 provided, among other things, that (with certain specified exceptions) a tax should be levied, collected, and paid annually upon the annual gains, profits, or income of every person residing in the United States, or of any citizen of the United States residing abroad, whether derived from *any kind of property, rents,* interest, dividends, salaries, or from any profession, trade, employment, or vocation, carried on in the United States or elsewhere, or *from any other source whatever.*    13 Stat. 281.

From this history of legislation and of judicial decisions it is manifest —

That, in the judgment of the members of this court as constituted when the *Hylton case* was decided — all of whom were statesmen and lawyers of distinction, two, Wilson and Paterson, being recognized as great leaders in the convention of 1787 — the only taxes that could certainly be regarded as direct taxes, within the meaning of the Constitution, were capitation taxes and taxes on lands;

That, in their opinion, a tax on real estate was properly classified as a direct tax, because, in the words of Justice Iredell, it was "a tax on something inseparably annexed to the soil," "something capable of apportionment," though, in the opinion of Mr. Justice Paterson, apportionment even of a tax on land was "scarcely practicable;"

That while the *Hylton case* did not, in terms, involve a decision in respect of lands, what was said by the judges on the subject was not, strictly speaking, *obiter dicta,* because the principle or rule that would determine whether a tax on carriages was a direct tax would necessarily indicate whether a tax on lands belonged to that class;

That, in the judgment of all the judges in the *Hylton case,* no tax was a direct one, that could not be apportioned among the States, on the basis of numbers, with some approach to justice and equality among the people of the several States who owned the property or subject taxed, for the reason, in

the words of Mr. Justice Chase, that the framers of the Constitution cannot be supposed to have contemplated taxation by a rule that "would evidently create great inequality and injustice;" or, in the words of Mr. Justice Paterson, would be "absurd and inequitable;" or, in the words of Mr. Justice Iredell, would lead, if practised, to "dangerous consequences," and be "altogether destructive of the notion of a common interest, upon which the very principles of the Constitution are founded;"

That by the judgment in the *Hylton case*, a tax on specific personal property, owned by the taxpayer and used or let to hire, was not a direct tax to be apportioned among the States on the basis of numbers;

That from the foundation of the government, until 1861, Congress following the declarations of the judges in the *Hylton case*, restricted direct taxation to real estate and slaves, and in 1861 to real estate exclusively, and has never, by any statute, indicated its belief that personal property, however assessed or valued, was the subject of "direct taxes" to be apportioned among the States;

That by the above two acts of January 18, 1815, the validity of which has never been questioned, Congress by laying duties, according to the rule of uniformity, upon the numerous articles of personal property mentioned in those acts, indicated its belief that duties on personal property were not direct taxes to be apportioned among the States on the basis of numbers, but were duties to be laid by the rule of uniformity, and without regard to the population of the respective States;

That in 1861 and subsequent years Congress imposed, without apportionment among the States on the basis of numbers, but by the rule of uniformity, duties on *income* derived *from every kind of property, real and personal*, including income derived from *rents*, and from trades, professions, and employments, etc.; and, lastly,

That upon every occasion when it has considered the question whether a duty on *incomes* was a direct tax within the meaning of the Constitution, this court has, *without a dissent-*

*ing voice,* determined it in the negative, always proceeding on the ground that capitation taxes and taxes on land were the only direct. taxes contemplated by the framers of the Constitution;

The view I have. given of *Hylton* v. *United States* is sustained by Mr. Justice Story's statement of the grounds upon which the court proceeded in that case. He says: "The grounds of this decision, as stated in the various opinions of the judges, were, first, the doubt whether any taxes were direct in the sense of the Constitution, but capitation and land taxes, as has been already suggested; secondly, that in cases of doubt the rule of apportionment ought not to be favored, because it was matter of compromise, and in itself radically indefensible and wrong; thirdly, the monstrous inequality and injustice of the carriage tax, if laid by the rule of apportionment, which would show that no tax of this sort could have been contemplated by the convention, as within the rule of apportionment; fourthly, that the terms of the Constitution were satisfied by confining the clause respecting direct taxes to capitation and land taxes; fifthly, that accurately speaking, all taxes on expenses or consumption are *indirect* taxes, and a tax on carriages is of this kind; and, sixthly, (what is probably of most cogency and force, and of itself decisive,) that no tax could be a direct one, in the sense. of the Constitution, which was not capable of apportionment according to the rule laid down in the Constitution." 1 Story Const. 705, § 956.

If the above summary as to the practice of the government, and the course of decision in this court, fairly states what was the situation, legislative and judicial, at the time the suits now before us were instituted, it ought not to be deemed necessary, in determining a question which this court has said was "exclusively in American jurisprudence," to ascertain what were the views and speculations of European writers and theorists in respect of the nature of taxation and the principles by which taxation should be controlled, nor as to what, on merely economic or scientific grounds, and under the systems of government prevailing in Europe, should be deemed direct

taxes, and what indirect taxes.  Nor ought this court to be embarrassed by the circumstance that statesmen of the early period of our history differed as to the principles or methods of national taxation, or as to what should be deemed direct taxes to be apportioned among the States and what indirect taxes, duties, imposts, and excises, that must be laid by some rule of uniformity applicable to the whole country without reference to the relative population of particular States. Undoubtedly, as already observed, Madison was of opinion that a tax on carriages was a direct tax within the meaning of the Constitution, and should be apportioned among the States on the basis of numbers.  But this court, in the *Hylton case*, rejected his view of the Constitution, sustained that of Hamilton, and, subsequently, Madison, as President, approved acts of Congress imposing taxes upon personal property without apportioning the same among the States.  The taxes which, in the opinion of Hamilton, ought to be apportioned among the States were not left by him in doubt; for in a draft of the Constitution prepared by him in 1787, it was provided that "taxes on lands, houses, and other real estate, and capitation taxes, shall be proportioned in each State by the whole number of free persons, except Indians not taxed, and by three-fifths of all other persons."  Art. VII, Sec. 4.  2 Hamilton's Works, 406.  The practice of a century, in harmony with the decisions of this court, under which uncounted millions have been collected by taxation, ought to be sufficient to close the door against further inquiry, based upon the speculations of theorists, and the varying opinions of statesmen who participated in the discussions, sometimes very bitter, relating to the form of government to be established in place of the Articles of Confederation under which, it has been well said, Congress could declare everything and do nothing.

But this view has not been accepted in the present cases, and the questions involved in them have been examined just as if they had not been settled by the long practice of the government, as well as by judicial decisions covering the entire period since 1796 and giving sanction to that practice.  It seems to me that the court has not given to the maxim of *stare decisis*

the full effect to which it is entitled. While obedience to that maxim is not expressly enjoined by the Constitution, the principle that decisions, resting upon a particular interpretation of that instrument, should not be lightly disregarded where such interpretation has been long accepted and acted upon by other branches of the government and by the public, underlies our American jurisprudence. There are many constitutional questions which were earnestly debated by statesmen and lawyers in the early days of the Republic. But having been determined by the judgments of this court, they have ceased to be the subjects of discussion. While, in a large sense, constitutional questions may not be considered as finally settled, unless settled rightly, it is certain that a departure by this court from a settled course of decisions on grave constitutional questions, under which vast transactions have occurred, and under which the government has been administered during great crises, will shake public confidence in the stability of the law.

Since the *Hylton case* was decided this country has gone through two great wars under legislation based on the principles of constitutional law previously announced by this court. The recent civil war, involving the very existence of the nation, was brought to a successful end, and the authority of the Union restored, in part, by the use of vast amounts of money raised under statutes imposing duties on incomes derived from every kind of property, real and personal, not by the unequal rule of apportionment among the States on the basis of numbers, but by the rule of uniformity, operating upon individuals and corporations in all the States. And we are now asked to declare — and the judgment this day rendered in effect declares — that the enormous sums thus taken from the people, and so used, were taken in violation of the supreme law of the land. The supremacy of the nation was reëstablished against armed rebellion seeking to destroy its life, but, it seems, that that consummation, so devoutly wished, and to effect which so many valuable lives were sacrificed, was attended with a disregard of the Constitution by which the Union was ordained.

The policy of the government in the matter of taxation for its support, as well as the decisions of this court, have been in harmony with the views expressed by Oliver Ellsworth, before he became the Chief Justice of this court. In the Connecticut Convention of 1788, when considering that clause of the proposed constitution giving Congress power to lay and collect taxes, duties, imposts, and excises, in order to pay the debts and provide for the common defence and general welfare of the United States, that far-seeing statesman — second to none of the Revolutionary period, and whom John Adams declared to be the firmest pillar of Washington's administration in the Senate — said: "The first objection is, that this clause extends to all the objects of taxation." "The state debt, which now lies heavy upon us, arose from the want of powers in the Federal system. Give the necessary powers to the National Government, and the State will not be again necessitated to involve itself in debt for its defence in war. It will lie upon the National Government to defend all the States, to defend all its members from hostile attacks. The United States will bear the whole burden of war. It is necessary that the power of the general legislature should extend to all the objects of taxation; that government should be able to command all the resources of the country; because no man can tell what our exigencies may be. Wars have now become rather wars of the purse than of the sword. Government must, therefore, be able to command the whole power of the purse; otherwise, a hostile nation may look into our Constitution, see what resources are in the power of government, and calculate to go a little beyond us; thus they may obtain a decided superiority over us, and reduce us to the utmost distress. A government which can command but half its resources is like a man with but one arm to defend himself." Flanders' Chief Justices, 150, 2d Series.

Let us examine the grounds upon which the decision of the majority rests, and look at some of the consequences that may result from the principles now announced. I have a deep, abiding conviction, which my sense of duty compels me to express, that it is not possible for this court to have

rendered any judgment more to be regretted than the one just rendered.

Assuming it to be the settled construction of the Constitution that the general government cannot tax *lands, eo nomine,* except by apportioning the tax among the States according to their respective numbers, does it follow that a tax on *incomes* derived from *rents* is a *direct* tax *on the real estate* from which such rents arise?

In my judgment a tax on *income* derived from real property ought not to be, and until now has never been, regarded by any court as a direct tax on such property within the meaning of the Constitution.  As the great mass of lands in most of the States do not bring any rents, and as incomes from rents vary in the different States, such a tax cannot possibly be apportioned among the States on the basis merely of numbers with any approach to equality of right among taxpayers, any more than a tax on carriages or other personal property could be so apportioned.  And, in view of former adjudications, beginning with the *Hylton case* and ending with the *Springer case,* a decision now that a tax on income from real property can be laid and collected only by apportioning the same among the States, on the basis of numbers, may, not improperly, be regarded as a judicial revolution, that may sow the seeds of hate and distrust among the people of different sections of our common country.

The principal authorities relied upon to prove that a tax on rents is a direct tax on the lands from which such rents are derived, are the decisions of this court holding that the States cannot, *in any form, directly or indirectly*, burden the exercise by Congress of the powers committed to it by the Constitution,[1] and those which hold that the national government cannot, *in any form, directly or indirectly,* burden the agencies

---

[1] *Brown* v. *Maryland,* 12 Wheat. 419, 444 ; *Weston* v. *Charleston,* 2 Pet. 449 ; *Dobbins* v. *Erie County Commissioners,* 16 Pet. 435 ; *Almy* v. *California,* 24 How. 169 ; *Railroad Company* v. *Jackson,* 7 Wall. 262 ; *Cook* v. *Pennsylvania,* 97 U. S. 566 ; *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* 122 U. S. 326 ; *Leloup* v. *Mobile,* 127 U. S. 640 ; *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688.

or instrumentalities employed by the States in the exercise of their powers.[1]   No one of the cases of either class involved any question as to what were " direct taxes" within the meaning of the Constitution.   They were cases in which it was held that the governmental power in question could not be burdened or impaired *at all* or in any mode, directly or indirectly, by the government that attempted to do so.   Every one must concede that those cases would have been decided just as they were decided, if there were no provision whatever in the Constitution relating to direct taxes or to taxation in any other mode.   All property in this country, except the property and the agencies and instrumentalities of the States, may be taxed, in some form, by the national government in order to pay the debts and provide for the common defence and general welfare of the United States; some, by direct taxation apportioned among the States on the basis of numbers; other kinds, by duties, imposts, and excises, under the rule of uniformity applicable throughout the United States to individuals and corporations, and without reference to population in any State.   Decisions, therefore, which hold that a State can neither directly nor indirectly obstruct the execution by the general government of the powers committed to it, nor burden with taxation the property and agencies of the United States, and decisions that the United States can neither directly nor indirectly burden nor tax the property or agencies of the State, nor interfere with the governmental powers belonging to the States, do not even tend to establish the proposition that a duty which, by its indirect operation, may affect the value or the use of particular property, is a direct tax on such property, within the meaning of the Constitution.

In determining whether a tax on income from rents is a direct tax, within the meaning of the Constitution, the inquiry is not whether it may in some way indirectly affect the land or the land owner, but whether it is a *direct* tax *on the thing*

---

[1] *Collector* v. *Day*, 11 Wall. 113; *United States* v. *Railroad Co.*, 17 Wall. 322, 332; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 178; *Mercantile Bank* v. *New York*, 121 U. S. 138, 162.

*taxed, the land.* The circumstance that such a tax may possibly have the effect to diminish the value of the use of the land is neither decisive of the question nor important.  While a tax *on the land* itself, whether at a fixed rate applicable to all lands without regard to their value, or by the acre or according to their market value, might be deemed a direct tax within the meaning of the Constitution as interpreted in the *Hylton case,* a duty on rents is a duty on something distinct and entirely separate from, although issuing out of, the land.

At the original hearing of this cause we were referred on this point to the statement by Coke to the effect that "if a man seized of land in fee by his deed granteth to another the profits of those lands, to have and to hold to him and his heirs, and maketh livery *secundum formam chartœ,* the whole land itself doth pass.  For what is the land but the profits thereof; for thereby vesture, herbage, trees, mines, all whatsoever, parcel of that land doth pass."  Co. Lit. 45.  (4 *b.*) 1 Har. & But. ed. § 1.

Of course, a grant, without limitation as to time, to a particular person and his *heirs,* of the *profits* of certain lands, accompanied by *livery of seizin,* would be construed as passing the lands themselves, unless a different interpretation were required by some statute.  In this connection Jarman on Wills (Vol. 1, 5th ed. 798*) is cited in support of the general proposition that a devise of the rents and profits or of the income of lands passes the land itself both at law and equity. But the editor, after using this language, adds: "And since the act 1 Vict. c. 26 such a devise carries a fee simple; but before that act it carried no more than an estate for life unless *words of inheritance were added.*"  Among the authorities cited by the editor, in reference to devises of the incomes of lands, are *Humphrey* v. *Humphrey,* 1 Sim. (N. S.) 536, 540, and *Mannox* v. *Greener,* L. R. 14 Eq. 456, 462.  In the first of those cases, the court held that "an *unlimited* gift of the income of a fund" passed the capital; in the other, that "a gift of the income of the land, *unrestricted,* is simply a gift of the fee simple of the land."  So, in *Fox* v. *Phelps,* 17 Wend. 393, 402, Justice Bronson, speaking for the court, said: "An

*unlimited* disposition of rents and profits or income of an estate will sometimes carry the estate itself. *Kerry* v. *Derrick*, Cro. Jac. 104; *Phillips* v. *Chamberlaine*, 4 Ves. 51. In *Newland* v. *Shepard*, 2 P. Wms. 194, a devise of the produce and interest of the estate to certain grandchildren for a limited period was held to pass the estate itself. But the authority of this case was denied by Lord Hardwicke in *Fonereau* v. *Fonereau*, 3 Atk. 315. The rule cannot apply where, as in this case, the rents and profits are only given *for a limited period. Earl* v. *Grim*, 1 Johns. Ch. 494." But who will say that a devise of rent already due, or profits already earned, is a devise of the land itself? Or who would say that a devise of rents, profits, or income of land for any period expressly limited, would pass the fee or the ownership of the land itself? The statute under examination in these causes expires by its own terms at the end of five years. It imposes an annual tax on the income of lands *received* the preceding year. It does not touch the lands themselves, nor interfere with their sale at the pleasure of the owner. It does not apply to lands from which no rent is derived. It gives no lien upon the lands to secure the payment of the duty laid on rents that may accrue to the landlord from them. It does not apply to rents due and payable by contract, and not collected, but only to such as are received by the taxpayer. But whether a grant or devise, with or without limitation or restriction, as to time, of the rents and profits or of the income of land passes the land itself, is wholly immaterial in the present causes. We are dealing here with questions relating to taxation for public purposes of income from rents, and not with any question as to the passing of title, by deed or will, to the real estate from which such rents may arise.

It has been well observed, on behalf of the government, that rents have nothing in common with land; that taking wrongful possession of land is trespass, while the taking of rent may, under some circumstances, be stealing; that the land goes to the heir while the rent-money goes to the personal representative; one has a fixed *situs*; that of the other may be determined by law, but generally is that of the owner;

that one is taxed, and can be taxed only, by the sovereignty within which it lies, while the other may be taxed, and can be taxed only, by the sovereignty under whose dominion the owner is; that a tax on land is generally a *lien* on the land, while that on personalty almost universally is not; and that, in their nature, lands and rents arising from land have not a single attribute in common. A tax on land reaches the land itself, whether it is rented or not. The citizen's residence may be reached by a land tax, although he derives no rent from it. But a duty on rents will not reach him, unless he rents his residence to some one else and receives the rent. A tax with respect to the money that a landlord receives for rent is personal to him, because it relates to his revenue from a designated source, and does not, in any sense — unless it be otherwise provided by statute — rest on the land. The tax in question was laid without reference to the land of the taxpayer; for the amount of rent is a subject of contract, and is not always regulated by the intrinsic value of the source from which the rent arises. In its essence it is a tax with reference only to income received.

But the court, by its judgment just rendered, goes far in advance not only of its former decisions, but of any decision heretofore rendered by an American court. Adhering to what was heretofore adjudged in these cases in respect of the taxation of income arising from real estate, it now adjudges, upon the same grounds on which it proceeds in reference to real estate and the income derived therefrom, that a tax " on personal property," or on the yield or income of personal property, or on capital in personalty held for the purpose of income or ordinarily yielding income, and on the income therefrom, or on the income from "*invested* personal property, bonds, stocks, investments of all kinds," is a direct tax within the meaning of the Constitution, which cannot be imposed by Congress unless it be apportioned among the States on the basis of population.

I cannot assent to the view that visible tangible personal property is not subject to a national tax under the rule of uniformity, whether such uniformity means only territorial uni-

formity, or equality of right among all taxpayers of the same class. When direct taxes are restricted to capitation taxes and taxes on land, taxation, in either form, is limited to subjects always found wherever population is found, and which cannot be consumed or destroyed. They are subjects which can always be seen and inspected by the assessor, and have immediate connection with the country and its soil throughout its entire limits. Not so with personal property. In *Veazie Bank* v. *Fenno,* above cited, it was said that personal property had never been regarded by Congress as subject to "direct taxes," although it was said that, in the opinion of some statesmen at the time of the adoption of the Constitution, direct taxes "*perhaps*" included such as might be levied "by valuation and assessment of personal property upon *general lists,*" or, as expressed by Hamilton in his argument in the *Hylton case,* "general assessments, whether on the whole property of individuals, or on their whole real or personal estate." 7 Hamilton's Works, 848. The statute now before us makes no provision for the taxation of personal property by valuation and assessment upon general lists.

In the *Hylton case* this court — proceeding, as I think, upon a sound interpretation of the Constitution, and in accordance with historical evidence of great cogency — unanimously held that an act imposing a specific duty on carriages for the conveyance of persons was a valid exercise of the power to lay and collect *duties,* as distinguished from direct taxes. The majority of the court now sustain the position taken by Madison, who insisted that such a duty was a direct tax within the meaning of the Constitution. So much pains would not have been taken to bring out his view of direct taxes, unless to indicate this court's approval of them, notwithstanding a contrary interpretation of the Constitution had been announced and acted upon for nearly one hundred years. It must be assumed, therefore, that the court, as now constituted, would adjudge to be unconstitutional not only any act like that of 1794 laying specific duties on carriages without apportioning the same among the States, but acts similar to those of 1815, laying duties, according to the rule of uniformity, upon

specific personal property owned or manufactured in this country.

In my judgment — to say nothing of the disregard of the former adjudications of this court, and of the settled practice of the government — this decision may well excite the gravest apprehensions.   It strikes at the very foundations of national authority, in that it denies to the general government a power which is, or may become, vital to the very existence and preservation of the Union in a national emergency, such as that of war with a great commercial nation, during which the collection of all duties upon imports will cease or be materially diminished.   It tends to reëstablish that condition of helplessness in which Congress found itself during the period of the Articles of Confederation, when it was without authority by laws operating directly upon individuals, to lay and collect, through its own agents, taxes sufficient to pay the debts and defray the expenses of government, but was dependent, in all such matters, upon the good will of the States, and their promptness in meeting requisitions made upon them by Congress.

Why do I say that the decision just rendered impairs or menaces the national authority?   The reason is so apparent that it need only be stated.   In its practical operation this decision withdraws from national taxation not only all incomes derived from real estate, but tangible personal property, "*invested* personal property, bonds, stocks, investments of all kinds,*" and the income that may be derived from such property.   This results from the fact that by the decision of the court, all such personal property and all incomes from real estate and personal property, are placed beyond national taxation otherwise than by *apportionment* among the States *on the basis* simply *of population.*   No such apportionment can possibly be made without doing gross injustice to the many for the benefit of the favored few in particular States.   Any attempt upon the part of Congress to apportion among the States, upon the basis simply of their population, taxation of personal property or of incomes, would tend to arouse such indignation among the freemen of America that it would never

be repeated. When, therefore, this court adjudges, as it does now adjudge, that Congress cannot impose a duty or tax upon personal property, or upon income arising either from rents of real estate or from personal property, including invested personal property, bonds, stocks, and investments of all kinds, except by apportioning the sum to be so raised among the States according to population, it *practically* decides that, *without an amendment of the Constitution* — two-thirds of both Houses of Congress and three-fourths of the States concurring — such property and incomes can never be made to contribute to the support of the national government.

But this is not all. The decision now made may provoke a contest in this country from which the American people would have been spared if the court had not overturned its former adjudications, and had adhered to the principles of taxation under which our government, following the repeated adjudications of this court, has always been administered. - Thoughtful, conservative men have uniformly held that the government could not be safely administered except upon principles of right, justice, and equality — without discrimination against any part of the people because of their owning or not owning visible property, or because of their having or not having incomes from bonds and stocks. But, by its present construction of the Constitution the court, for the first time in all its history, declares that our government has been so framed that, in matters of taxation for its support and maintenance those who have incomes derived from the renting of real estate or from the leasing or using of tangible personal property, or who own invested personal property, bonds, stocks and investments of whatever kind, have privileges that cannot be accorded to those having incomes derived from the labor of their hands, or the exercise of their skill, or the use of their brains. Let me illustrate this. In the large cities or financial centres of the country there are persons deriving enormous incomes from the renting of houses that have been erected, not to be occupied by the owner, but for the sole purpose of being rented. Near by are other persons, trusts, combinations, and corporations, possessing vast quantities of personal property, including bonds and

stocks of railroad, telegraph, mining, telephone, banking, coal, oil, gas, and sugar-refining corporations, from which millions upon millions of income are regularly derived.  In the same neighborhood are others who own neither real estate, nor invested personal property, nor bonds, nor stocks of any kind, and whose entire income arises from the skill and industry displayed by them in particular callings, trades, or professions, or from the labor of their hands, or the use of their brains. And it is now the law, as this day declared, that under the Constitution, however urgent may be the needs of the Government, however sorely the administration in power may be pressed to meet the moneyed obligations of the nation, Congress cannot tax the personal property of the country, nor the income arising either from real estate or from invested personal property, except by a tax apportioned among the States, on the basis of their population, while it *may* compel the merchant, the artisan, the workman, the artist, the author, the lawyer, the physician, even the minister of the Gospel, no one of whom happens to own real estate, invested personal property, stocks or bonds, to contribute directly from their respective earnings, gains, and profits, and under the rule of uniformity or equality, for the support of the government.

The Attorney General of the United States very appropriately said that the constitutional exemption from taxation of incomes arising from the rents of real estate, otherwise than by a direct tax, apportioned among the States on the basis of numbers, was a new theory of the Constitution, the importance of which to the whole country could not be exaggerated. If any one has questioned the correctness of that view of the decision rendered on the original hearing, it ought not again to be questioned, now that this court has included in the constitutional exemption from the rule of uniformity, the personal property of the country and incomes derived from invested personal property.  If Congress shall hereafter impose an income tax in order to meet the pressing debts of the nation and to provide for the necessary expenses of the government, it is advised, by the judgment now rendered, that it cannot touch the income from real estate nor the income from personal property, in-

vested or uninvested, except by apportionment among the
States on the basis of population. Under that system the
people of a State, containing 1,000,000 of inhabitants, who
receive annually $20,000,000 of income from real and personal
property, would pay no more than would be exacted from the
people of another State, having the same number of inhabi-
·tants, but who receive income from the same kind of property
of only $5,000,000.   If this new theory of the Constitution, as
I believe it to be, if this new departure from the safe way
marked out by the fathers and so long followed by this court,
is justified by the fundamental law, the American people can-
not too soon amend their Constitution.

It was said in argument that the passage of the statute im-
posing this income tax was an assault by the poor upon the
rich, and by much eloquent speech this court has been urged
to stand in the breach for the protection of the just rights of
property against the advancing hosts of socialism.   With the
policy of legislation of this character, this court has nothing
to do.   That is for the legislative branch of the government.
It is for Congress to determine whether the necessities of the
government are to be met, or the interests of the people sub-
served, by the taxation of incomes.   With that determination,
so far as it rests upon grounds of expediency or public policy,
the courts can have no rightful concern.   The safety and
permanency of our institutions demand that each department
of government shall keep within its legitimate sphere as de-
fined by the supreme law of the land.   We deal here only
with questions of law. 'Undoubtedly, the present law contains
exemptions that are open to objection, but, for reasons to be
presently stated, such exemptions may be disregarded without
invalidating the entire law and the property so exempted
may be reached under the general provisions of the statute.
*Huntington* v. *Worthen*, 120 U. S. 97, 102.

If it were true that this legislation, in its important aspects
and in its essence, discriminated against the rich, because of
'their wealth, the court, in vindication of the equality of all
before the law, might well declare that the statute was not an
exercise of the power of *taxation*, but was repugnant to those

principles of natural right upon which our free institutions rest, and, therefore, was legislative spoliation, under the guise of taxation. But it is not of that character. There is no foundation for the charge that this statute was framed in sheer hostility to the wealth of the country. The provisions most liable to objection are those exempting from taxation large amounts of accumulated capital, particularly that represented by savings banks, mutual insurance companies, and loan associations. Surely such exemptions do not indicate sympathy on the part of the legislative branch of the government with the pernicious theories of socialism, nor show that Congress had any purpose to despoil the rich.

In this connection, and as a ground for annulling the provisions taxing incomes, counsel for the appellant refers to the exemption of incomes that do not exceed $4000. It is said that such an exemption is too large in amount. That may be conceded. But the court cannot for that reason alone declare the exemption to be invalid. Every one, I take it, will concede that Congress, in taxing incomes, may rightfully allow an exemption in some amount. That was done in the income tax laws of 1861 and in subsequent laws, and was never questioned. Such exemptions rest upon grounds of public policy, of which Congress must judge, and of which this court cannot rightfully judge; and that determination cannot be interfered with by the judicial branch of the government, unless the exemption is of such a character and is so unreasonably large as to authorize the court to say that Congress, under the pretence merely of legislating for the general good, has put upon a few persons burdens that, by every principle of justice and under every sound view of *taxation*, ought to have been placed upon all or upon the great mass of the people. If the exemption had been placed at $1500 or even $2000, few, I think, would have contended that Congress, in so doing, had exceeded its powers. In view of the increased cost of living at this day, as compared with other times, the difference between either of those amounts and $4000 is not so great as to justify the courts in striking down all of the income tax provisions. The basis upon which such exemptions rest is that

the general welfare requires that in taxing incomes, such exemption should be made as will fairly cover the annual expenses of the average family, and thus prevent the members of such families becoming a charge upon the public.   The statute allows corporations, when making returns of their net profits or income, to deduct actual operating and business expenses.   Upon like grounds, as I suppose, Congress exempted incomes under $4000.

I may say, in answer to the appeals made to this court to vindicate the constitutional rights of citizens owning large properties and having large incomes, that the real friends of property are not those who would exempt the wealth of the country from bearing its fair share of the burdens of taxation, but rather those who seek to have every one, without reference to his locality, contribute from his substance, upon terms of equality with all others, to the support of the government. There is nothing in the nature of an income tax *per se* that justifies *judicial* opposition to it upon the ground that it illegally discriminates against the rich or imposes undue burdens upon that class.   There is no tax which, in its essence, is more just and equitable than an income tax, if the statute imposing it allows only such exemptions as are demanded by public considerations and are consistent with the recognized principles of the equality of all persons before the law, and, while providing for its collection in ways that do not unnecessarily irritate and annoy the taxpayer, reaches the earnings of the entire property of the country, except governmental property and agencies, and compels those, whether individuals or corporations, who receive such earnings, to contribute therefrom a reasonable amount for the support of the common government of all.

We are told in argument that the burden of this income tax, if collected, will fall, and was imposed that it might fall, almost entirely upon the people of a few States, and that it has been imposed by the votes of Senators and Representatives of States whose people will pay relatively a very small part of it.   This suggestion, it is supposed, throws light upon the construction to be given to the Constitution, and consti-

tutes a sufficient reason why this court should strike down the provision that Congress has made for an income tax. It is a suggestion that ought never to have been made in a court of justice. But it seems to have received some consideration; for, it is said that the grant of the power to lay and collect direct taxes was, in the belief of the framers of the Constitution, that it would not be exercised "unfairly and discriminately, as to particular States or otherwise, by a mere majority vote, possibly of those whose constituents were intentionally not subjected to any part of the burden." It is cause for profound regret that it has been deemed appropriate to intimate that the law now before us had its origin in a desire upon the part of a majority in the two Houses of Congress to impose undue burdens upon the people of particular States.

I am unable to perceive that the performance of our duty should depend, in any degree, upon an inquiry as to the residence of the persons who are required by the statute to pay this income tax. If, under the bounty of the United States, or the beneficent legislation of Congress, or for any other reason, some parts of the country have outstripped other parts in population and wealth, that surely is no reason why people of the more favored States should not share in the burdens of government alike with the people of all the States of the Union. Is a given body of people in one part of the United States, although owning vast properties, from which many millions are regularly derived, of more consequence in the eye of the Constitution or of the judicial tribunals than the like number of people in other parts of the country who do not enjoy the same prosperity? Arguments that rest upon favoritism by the law-making power to particular sections of the country and to mere property, or to particular kinds of property, do not commend themselves to my mind; for, they cannot but tend to arouse a conflict that may result in giving life, energy, and power as well to those in our midst who are eager to array section against section as to those, unhappily not few in number, who are without any proper idea of our free institutions, and who have neither respect for the rights of property nor any conception of what is liberty regulated by law.

It is said that if the necessity exists for the general government to raise by direct taxation a given sum of money, in addition to the revenue from duties, imposts, and excises, the quota of each State can be apportioned on the basis of the census, and the government can proceed to assess the amount to be raised on all the real and personal property, as well as the income, of all persons in the State, and collect the tax, if the State does not in the meantime pay its quota, and reimburse itself, by collecting the amount paid by it, according to its own system and in its own way. Of course, it is not difficult to understand that a direct tax, when assessed, may be collected by the general government without waiting for the States to pay the sum apportioned to their people, or that time may be given to the States to pay such amounts. But that view does not meet the argument that the assessment and collection of a direct tax on incomes — such tax being apportioned on the basis merely of numbers in the respective States — was never contemplated by the framers of the Constitution. Whether such a tax be collected by the general government through its own agents, or by the State, from such of the people *as have incomes subject to the tax imposed,* is immaterial to the discussion. In either case, the gross injustice that would result would be the same.

If Congress should lay a tax of a given aggregate amount on *incomes* (above a named sum) from every taxable source, and apportion the same among the States on the basis of numbers, could any State be expected to assume and pay the sum assigned to it, and then proceed to reimburse itself by taxing *all* the property, real and personal, within its limits, thereby compelling those who have no taxable incomes to contribute from their means to pay taxes assessed upon those who have taxable incomes? Would any State use money belonging to all of its people for the purpose of discharging taxes due from, or assessed against, a part of them? Is it not manifest that a national tax laid on incomes or on specific personal property, if apportioned among the States on the basis of population, might be ruinous to the people of those States in which the number having taxable incomes, or

who owned that particular kind of property, were relatively few when the entire population of the State is taken into account?   So diversified are the industries of the States composing the Union that, if the government should select particular subjects or products for taxation and apportion the sum to be raised among the States, according to their population, the amount paid by some of the States would be out of all proportion to the quantity or value of such products within their respective limits.

It has been also said, or rather it is intimated, that the framers of the Constitution intended that the power to lay direct taxes should only be exercised in time of war, or in great emergencies, and that a tax on incomes is not justified in times of peace.   Is it to be understood that the courts may annul an act of Congress imposing a tax on incomes, whenever in their judgment such legislation is not demanded by any public emergency or pressing necessity?   Is a tax on incomes permissible in a time of war, but unconstitutional in a time of peace?   Is the judiciary to supervise the action of the legislative branch of the government upon questions of public policy?   Are they to override the will of the people, as expressed by their chosen servants, because, in their judgment, the particular means employed by Congress in execution of the powers conferred by the Constitution are not the best that could have been devised, or are not absolutely necessary to accomplish the objects for which the government was established?

It is further said that the withdrawal from national taxation, except by apportionment among the States on the basis of numbers, of personal property, bonds, stocks, and investments of all kinds, and the income arising therefrom, as well as the income derived from real estate, is intrinsically just, because all such property and all such incomes can be made to bear, and do bear, their share of the burdens that come from state taxation.   But those who make this argument forget that *all* the property which, by the decision now rendered, remains subject to national taxation by the rule of uniformity is, also, subject to be taxed by the respective

States.   Incomes arising from trades, employments, callings, and professions can be taxed, under the rule of uniformity or equality, by both the national government and the respective state governments, while incomes from property, bonds, stocks, and investments cannot, under the present decision, be taxed by the national government except under the impracticable rule of apportionment among the States according to population.   No sound reason for such a discrimination has been or can be suggested.

I am of opinion that with the exception of capitation and land taxes, and taxes on exports from the States and on the property and instrumentalities of the States, the government of the Union, in order to pay its debts and provide for the common defence and the general welfare, and under its power to lay and collect taxes, duties, imposts, and excises, may reach, under the rule of uniformity, all property and property rights in whatever State they may be found.   This is as it should be, and as it must be, if the national government is to be administered upon principles of right and justice, and is to accomplish the beneficent ends for which it was established by the People of the United States.   The authority to sustain itself, and, by its own agents and laws, to execute the powers granted to it, are the features that particularly distinguish the present government from the Confederation which Washington characterized as " a half-starved, limping government," that was " always moving upon crutches and tottering at every step."   The vast powers committed to the present government may be abused, and taxes may be imposed by Congress which the public necessities do not in fact require, or which may be forbidden by a wise policy.   But the remedy for such abuses is to be found at the ballot-box, and in a wholesome public opinion which the representatives of the people will not long, if at all, disregard, and not in the disregard by the judiciary of powers that have been committed to another branch of the government.

I turn now to another part of these cases.   The majority having decided that the income tax provisions of the statute in question are unconstitutional in so far as they impose a tax on

income derived from rents, or on income derived from personal property, including invested personal property, the conclusion has been. reached that *all* the income tax provisions of the statute, those that are valid. as well as those held to be invalid, must be held inoperative and void.  And so the judgment now to be entered takes from the government the entire revenue that Congress expected to raise by the taxation of incomes.  This revenue, according to all the estimates submitted to us in argument, would not have been less than $30,000,000.  Some have estimated that it would amount to $40,000,000 or $50,000,000.

The ground upon which the court now strikes down all the provisions of the statute relating in anywise to incomes is, that it cannot be assumed that Congress would have provided for an income tax at all, if it had been known or believed that the provisions taxing incomes from rents and from invested personal property were unconstitutional and void.

In *Allen* v. *Louisiana,* 103 U. S. 80, 84, this court said that it was an elementary principle " that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand, while that which is unconstitutional will be rejected."  " The point to be determined in all such cases," the court further said, " is whether the unconstitutional provisions are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature."

A leading case on this subject is *Huntington* v. *Worthen,*. 120 U. S. 97, 102.  The constitution of Arkansas of 1874 provided that all property subject to taxation should be taxed according to its value, to be ascertained in such manner as the general assembly might direct, making the same equal and uniform throughout the State, and that no one species of property from which a tax may be collected should be taxed higher than another species of property of equal value.  The constitution of the State further declared that all laws exempting property from taxation other than as provided in that instrument should be void.  No part of the property of rail-

road companies was exempted by the constitution from taxa-
tion.   A subsequent statute provided for the taxation of the
property of railroad companies, excepting, however, from the
schedule of property required to be returned "embankments,
turnouts, cuts, ties, trestles, or bridges."   This court held that
the exemption of these items of railroad property was invalid,
and the question arose whether the statute could be enforced.
This court said :  " The unconstitutional part of the statute was
separable from the remainder.   The statute declared that, in
making its statement of the value of its property, the rail-
road company should omit certain items; that clause being
held invalid, the rest remained unaffected, and could be
fully carried out.   An exemption, which was invalid, was
alone taken from it.   It is only when different clauses of an
act are so dependent upon each other that it is evident the
legislature would not have enacted one of them without the
other — as when the two things provided are necessary parts
of one system — the whole act will fall with the invalidity of
one clause.   When there is no such connection and depend-
ency, the act will stand, though different parts of it are
rejected."

It should be observed that the legislature of Arkansas
evinced a purpose not to tax embankments, turnouts, cuts, ties,
trestles, or bridges, and yet their exemption of those items
was disregarded and such property was taxed.   The same rule
could be applied to the present statute.

The opinion and judgment of the court on the original hear-
ing of these cases annulled only so much of the statute as laid
a duty on incomes derived from rents.   The opinion and judg-
ment on this rehearing annuls also so much of the statute as
lays a duty on the yield or income derived from personal prop-
erty, including invested personal property, bonds, stocks, in-
vestments of all kinds.   I recognize that with all these parts
of the statute stricken out, the law would operate unequally
and unjustly upon many of the people.   But I do not feel at
liberty to say that the balance of the act relating to incomes
from other and distinct sources must fall.

It seems to me that the cases do not justify the conclusion

that *all* the income tax sections of the statute must fall because some of them are declared to be invalid.    Those sections embrace a large number of taxable subjects that do not depend upon, and have no necessary connection whatever with, the sections or clauses relating to income from rents of land and from personal property.    As the statute in question states that its principal object was to reduce taxation and provide revenue, it must be assumed that such revenue is needed for the support of the government, and, therefore, its sections, so far as they are valid, should remain, while those that are invalid should be disregarded.    The rule referred to in the cases above cited should not be applied with strictness where the law in question is a general law providing a revenue for the government.    Parts of the statute being adjudged to be void, the injustice done to those whose incomes may be reached by those provisions of the statute that are not declared to be, in themselves, invalid, could, in some way, be compensated by subsequent legislation.

If the sections of the statute relating to a tax upon incomes derived from other sources than rents and invested personal property are to fall because and only because those relating to rents and to income from invested personal property are invalid, let us see to what result such a rule may logically lead.    There is no distinct, separate *statute* providing for a tax upon incomes.    The income tax is prescribed by certain sections of a general statute known as the Wilson Tariff act. The judgment just rendered defeats the purpose of Congress by taking out of the revenue not less than thirty millions, and possibly fifty millions of dollars, expected to be raised by the duty on incomes.    We know from the official journals of both Houses of Congress that taxation on imports would not have been reduced to the extent it was by the Wilson act, except for the belief that that could be safely done if the country had the benefit of revenue derived from a tax on incomes.    We know, from official sources, that each House of Congress distinctly refused to strike out the provisions imposing a tax on incomes.    The two Houses indicated in every possible way that it *must* be a part of any scheme for

the reduction of taxation and for raising revenue for the support of the government, that (with certain specified exceptions) incomes arising from every kind of property and from every trade and calling should bear some of the burdens of the taxation imposed. If the court knows, or is justified in believing, that Congress would not have provided an income tax that did not include a tax on incomes from real estate and personal property, we are more justified in believing that no part of the Wilson act would have become a law, without provision being made in it for an income tax. If, therefore, all the income tax sections of the Wilson act must fall because some of them are invalid, does not the judgment this day rendered furnish ground for the contention that the entire act falls when the court strikes from it all of the income tax provisions, without which, as every one knows, the act would never have been passed?

But the court takes care to say that there is no question as to the validity of any part of the Wilson act, except those sections providing for a tax on incomes. Thus something is saved for the support and maintenance of the government. It, nevertheless, results that those parts of the Wilson act that survive the new theory of the Constitution evolved by these cases, are those imposing burdens upon the great body of the American people who derive no rents from real estate, and who are not so fortunate as to own invested personal property, such as the bonds or stocks of corporations, that hold within their control almost the entire business of the country.

Such a result is one to be deeply deplored. It cannot be regarded otherwise than as a disaster to the country. The decree now passed dislocates — principally, for reasons of an economic nature — a sovereign power expressly granted to the general government and long recognized and fully established by judicial decisions and legislative actions. It so interprets constitutional provisions, originally designed to protect the slave property against oppressive taxation, as to give privileges and immunities never contemplated by the founders of the government.

If the decision of the majority had stricken down all the income tax sections, either because of unauthorized exemptions, or because of defects that could have been remedied by subsequent legislation, the result would not have been one to cause anxiety or regret; for, in such a case, Congress could have enacted a new statute that would not have been liable to constitutional objections.   But the serious aspect of the present decision is that by a new interpretation of the Constitution, it so ties the hands of the legislative branch of the government, that without an amendment of that instrument, or unless this court, at some future time, should return to the old theory of the Constitution, Congress cannot subject to taxation — however great the needs or pressing the necessities of the government — either the invested personal property of the country, bonds, stocks, and investments of all kinds, or the income arising from the renting of real estate, or from the yield of personal property, except by the grossly unequal and unjust rule of apportionment among the States. Thus, undue and disproportioned burdens are placed upon the many, while the few, safely entrenched behind the rule of apportionment among the States on the basis of numbers, are permitted to evade their share of responsibility for the support of the government ordained for the protection of the rights of all.

I cannot assent to an interpretation of the Constitution that impairs and cripples the just powers of the National Government in the essential matter of taxation, and at the same time discriminates against the greater part of the people of our country.

The practical effect of the decision to-day is to give to certain kinds of property a position of favoritism and advantage inconsistent with the fundamental principles of our social organization, and to invest them with power and influence that may be perilous to that portion of the American people upon whom rests the larger part of the burdens of the government, and who ought not to be subjected to the dominion of aggregated wealth any more than the property of the country should be at the mercy of the lawless.

I dissent from the opinion and judgment of the court.

Mr. Justice Brown dissenting.

If the question what is, and what is not, a direct tax, were now, for the first time, presented, I should entertain a grave doubt whether, in view of the definitions of a direct tax given by the courts and writers upon political economy, during the present century, it ought not to be held to apply not only to an income tax, but to every tax, the burden of which is borne, both immediately and ultimately, by the person paying it. It does not, however, follow that this is the definition had in mind by the framers of the Constitution. The clause that direct taxes shall be apportioned according to the population was adopted, as was said by Mr. Justice Paterson, in *Hylton v. United States*, to meet a demand on the part of the Southern States, that representatives and direct taxes should be apportioned among the States according to their respective numbers. In this connection he observes: " The provision was made in favor of the Southern States.   They possessed a large number of slaves ; they had extensive tracts of territory, thinly settled and not very productive.   A majority of the States had but few slaves, and several of them a limited territory, well settled and in a high state of cultivation.   The Southern States, if no provision had been introduced in the Constitution, would have been wholly at the mercy of the other States.   Congress, in such case, might tax slaves, at discretion or arbitrarily, and land in every part of the Union at the same rate or measure ; so much a head in the first instance, and so much an acre in the second.   To guard them against imposition, in these particulars, was the reason for introducing the clause in the Constitution, which directs that representatives and direct taxes shall be apportioned among the States according to their respectives numbers."   3 Dall. 177.

In view of the fact that the great burden of taxation among the several States is assessed upon real estate at a valuation, and that a similar tax was apparently an important part of the revenue of such States at the time the Constitution was

adopted, it is not unreasonable to suppose that this is the only undefined direct tax the framers of the Constitution had in view when they incorporated this clause into that instrument. The significance of the words " direct taxes " was not so well understood then as it is now, and it is entirely probable that these words were used with reference to a generally accepted method of raising a revenue by tax upon real estate.

That the rule of apportionment was adopted for a special and temporary purpose, that passed away with the existence of slavery, and that it should be narrowly construed, is also evident from the opinion of Mr. Justice Paterson, wherein he says that " the Constitution has been considered as an accommodating system ; it was the effect of mutual sacrifices and concessions ; it was the work of compromise. The rule of apportionment is of this nature ; it is radically wrong ; it cannot be supported by any solid reasoning. Why should slaves, who are a species of property, be represented more than any other property ? The rule ought not, therefore, to be extended by construction. Again, numbers do not afford a just estimate or rule of wealth. It is, indeed, a very uncertain and incompetent sign of opulence. There is another reason against the extension of the principle, laid down in the Constitution."

But, however this may be, I regard it as very clear that the clause requiring direct taxes to be apportioned to the population has no application to taxes which are not capable of apportionment according to population. It cannot be supposed that the convention could have contemplated a practical inhibition upon the power of Congress to tax in some way all taxable property within the jurisdiction of the Federal government, for the purposes of a national revenue. And if the proposed tax were such that in its nature it could not be apportioned according to population, it naturally follows that it could not have been considered a direct tax, within the meaning of the clause in question. This was the opinion of Mr. Justice Iredell in the *Hylton case*, wherein he shows at considerable length the fact that the tax upon carriages, in question in that case, was not such as could be apportioned, and, therefore, was not a direct tax in the sense of the Constitution. " Suppose," he said, " ten dol-

lars contemplated as a tax on each chariot, or post chaise, in the United States, and the number of both in all the States be computed at 105 — the number of Representatives in Congress — this would produce in the whole one thousand and fifty dollars; the share of Virginia, being $\frac{19}{105}$ parts, would be $190; the share of Connecticut, being $\frac{7}{105}$ parts, would be $70; then suppose Virginia had fifty carriages, Connecticut two, the share of Virginia being $190, this must of course be collected from the owners of carriages, and there would, therefore, be collected from each carriage $3.80; the share of Connecticut being $70, each carriage would pay $35." In fact, it needs no demonstration to show that taxes upon carriages or any particular article of personal property, apportioned to the population of the several States, would lead to the grossest inequalities, since the number of like articles in such State respectively might bear a greatly unequal proportion to the population. This was also the construction put upon the clause by Mr. Justice Story, in his work upon the Constitution, §§ 955, 956.

Applying the same course of reasoning to the income tax, let us see what the result would be. By the census of 1890 the population of the United States was 62,622,250. Suppose Congress desired to raise by an income tax the same number of dollars, or the equivalent of one dollar from each inhabitant. Under this system of apportionment, Massachusetts would pay $2,238,943. South Carolina would pay $1,151,149. Massachusetts has, however, $2,803,645,447 of property, with which to pay it, or $1252 *per capita*, while South Carolina has but $400,911,303 of property, or $348 to each inhabitant. Assuming that the same amount of property in each State represents a corresponding amount of income, each inhabitant of South Carolina would pay in proportion to his means three and one-half times as much as each inhabitant of Massachusetts. By the same course of reasoning, Mississippi, with a valuation of $352 *per capita*, would pay four times as much as Rhode Island, with a valuation of $1459 *per capita*. North Carolina, with a valuation of $361 *per capita*, would pay about four times as much, in proportion to her means, as New York,

with a valuation of $1430 *per capita*; while Maine, with a *per capita* valuation of $740, would pay about twice as much. Alabama, with a valuation of $412, would pay nearly three times as much as Pennsylvania, with a valuation of $1177 *per capita*. In fact, there are scarcely two States that would pay the same amount in proportion to their ability to pay.

If the States should adopt a similar system of taxation, and allot the amount to be raised among the different cities and towns, or among the different wards of the same city, in proportion to their population, the result would be so monstrous that the entire public would cry out against it. Indeed, reduced to its last analysis, it imposes the same tax upon the laborer that it does upon the millionaire.

So also, whenever this court has been called upon to give a construction to this clause of the Constitution, it has universally held the words " direct taxes " applied only to capitation taxes and taxes upon land. In the five cases most directly in point it was held that the following taxes were not direct, but rather in the nature of duty or excise, viz., a tax upon carriages, *Hylton* v. *United States*, 3 Dall. 171; a tax upon the business of insurance companies, *Pacific Insurance Co.* v. *Soule*, 7 Wall. 443; a tax of ten per cent upon the notes of state banks held by national banks, *Veazie* v. *Fenno*, 8 Wall. 533; a tax upon the devolution of real estate, *Scholey* v. *Rew*, 23 Wall. 331; and, finally, a general income tax was broadly upheld in *Springer* v. *United States*, 102 U. S. 586. These cases, consistent and undeviating as they are, and extending over nearly a century of our national life, seem to me to establish a canon of interpretation, which it is now too late to overthrow, or even to question. If there be any weight at all to be given to the doctrine of *stare decisis*, it surely ought to apply to a theory of constitutional construction, which has received the deliberate sanction of this court in five cases, and upon the faith of which Congress has enacted two income taxes at times when, in its judgment, extraordinary sources of revenue were necessary to be made available.

I have always entertained the view that, in cases turning upon questions of jurisdiction, or involving only the rights

of private parties, courts should feel at liberty to settle principles of law according to the opinions of their existing members, neither regardless of, nor implicitly bound by, prior decisions, subject only to the condition that they do not require the disturbance of settled rules of property. There are a vast number of questions, however, which it is more important should be settled in some way than that they should be settled right, and once settled by the solemn adjudication of the court of last resort, the legislature and the people have a right to rely upon such settlement as forever fixing their rights in that connection. Even "a century of error" may be less pregnant with evil to the State than a long deferred discovery of the truth. I cannot reconcile myself to the idea that adjudications thus solemnly made, usually by a unanimous court, should now be set aside by reason of a doubt as to the correctness of those adjudications, or because we may suspect that possibly the cases would have been otherwise decided, if the court had had before it the wealth of learning which has been brought to bear upon the consideration of this case. Congress ought never to legislate, in raising the revenues of the government, in fear that important laws like this shall encounter the veto of this court through a change in its opinion, or be crippled in great political crises by its inability to raise a revenue for immediate use. Twice in the history of this country such exigencies have arisen, and twice has Congress called upon the patriotism of its citizens to respond to the imposition of an income tax — once in the throes of civil war, and once in the exigency of a financial panic, scarcely less disastrous. The language of Mr. Justice Baldwin, in *Grignon's Lessee* v. *Astor*, 2 How. 319, 343, though referring to a different class of cases, seems to me perfectly apposite to the one under consideration. "We do not deem it necessary, now or hereafter, to retrace the reasons or the authorities on which the decisions of this court in that, or the cases which preceded it, rested; they are founded on the oldest and most sacred principles of the common law. Time has consecrated them; the courts of the State have followed, and this court has never departed from

them.  They are rules of property upon which the repose of the country depends; titles acquired under the proceedings of courts of competent jurisdiction must be deemed inviolable in collateral actions, or none can know what is his own."

It must be admitted, however, that in none of these cases has the question been directly presented as to what are taxes upon land within the meaning of the constitutional provision. Notwithstanding the authorities cited upon this point by the Attorney General, notably, *Jeffrey's Case,* 5 Coke, 67 ; *Theed* v. *Starkey,* 8 Mod. 314 ; *Case* v. *Stephens,* Fitzgibbon, 297 ; *Palmer* v. *Power,* 4 Irish C. L. (1854) 191 ; and *Van Rensselaer* v. *Dennison,* 8 Barb. 23, to the effect that a tax upon a person with respect to his land, or the profits of his land, is not a tax upon the land itself, I regard the doctrine as entirely well settled in this court, that a tax upon an incident to a prohibited thing is a tax upon the thing itself, and, if there be a total want of power to tax the thing, there is an equal want of power to tax the incident.   A summary of the cases upon this point may not be inappropriate in this connection.   Thus, in *Brown* v. *Maryland,* 12 Wheat. 419, a license tax upon an importer was held to be invalid as a tax upon imports ; in *Weston* v. *Charleston,* 2 Pet. 449, a tax upon stock for loans to the United States was held invalid as a tax upon the functions of the government; in *Dobbins* v. *Commissioners,* 16 Pet. 435, a state tax on the salary of an office invalid, as a tax upon the office itself ; in the *Passenger Cases,* 7 How. 283, a tax upon alien passengers arriving in ports of the State was held void as a tax upon commerce ; in *Almy* v. *California,* 24 How. 169, a stamp tax upon bills of lading was held to be a tax upon exports ; in *Crandall* v. *Nevada,* 6 Wall. 35, a tax upon railroads and stage companies for every passenger carried out of the State, was held to be a tax on the passenger for the privilege of passing through the State ; in *Pickard* v. *Pullman Southern Car Co.,* 117 U. S. 34, a tax upon Pullman cars running between different States was held to be bad as a tax upon interstate commerce ; and in *Leloup* v. *Mobile,* 127 U. S. 640, a similar ruling was made with regard to a license tax

for telegraph companies; and finally, in *Cook* v. *Pennsyl-vania*, 97 U. S. 566, a tax upon the sales of goods was held to be a tax upon the goods themselves. Indeed, cases to the same effect are almost innumerable. In the light of these cases, I find it impossible to escape the conclusion that a tax upon the rents or income of real estate is a tax upon the land itself.

But this does not cover the whole question. To bring the tax within the rule of apportionment, it must not only be a tax upon land, but it must be a *direct* tax upon land. The Constitution only requires that direct taxes be laid by the rule of apportionment. We have held that direct taxes include among others taxes upon land; but it does not follow from these premises that every tax upon land is a direct tax. A tax upon the product of land, whether vegetable, animal, or mineral, is in a certain sense, and perhaps within the decisions above mentioned, a tax upon the land. "For," as Lord Coke said, "what is the land but the profits thereof?" But it seems to me that it could hardly be seriously claimed that a tax upon the crops and cattle of the farmer, or the coal and iron of the miner, though levied upon the property while it remained upon the land, was a direct tax upon the land. A tax upon the rent of land in my opinion falls within the same category. It is rather a difference in the name of the thing taxed, than in the principle of the taxation. The rent is no more directly the outgrowth or profit of the land than the crops or the coal, and a direct tax upon either is only an indirect tax upon the land. While, within the cases above cited, it is a tax upon land, it is a direct tax only upon one of the many profits of land, and is not only not a direct tax upon the land itself, but is also subject to the other objection that it is, in its nature, incapable of apportionment according to population.

It is true that we have often held that what cannot be done directly cannot be done indirectly, but this applies only when it cannot be done at all, directly or indirectly; but if it can be done directly in one manner, *i.e.* by the rule of apportionment, it does not follow that it may not be done indirectly

in another manner. There is no want of power on the part of Congress to tax land, but in exercising that power it must impose direct taxes by the rule of apportionment. The power still remains, however, to impose indirect taxes by the rule of uniformity. Being of opinion that a tax upon rents is an indirect tax upon lands, I am driven to the conclusion that the tax in question is valid.

The tax upon the income of municipal bonds falls obviously within the other category, of an indirect tax upon something which Congress has no right to tax at all, and hence is invalid. Here is a question, not of the method of taxation, but of the power to subject the property to taxation in any form. It seems to me that the cases of *Collector* v. *Day*, 11 Wall. 113, holding that it is not competent for Congress to impose a tax upon the salary of a judicial officer of a State; *McCulloch* v. *Maryland*, 4 Wheat. 316, holding that a State could not impose a tax upon the operation of the Bank of the United States; and *United States* v. *Railroad Co.*, 17 Wall. 322, holding that a municipal corporation is a portion of the sovereign power of the State, and is not subject to taxation by Congress upon its municipal revenues; *Wisconsin Central Railroad* v. *Price*, 133 U. S. 496, holding that no State has the power to tax the property of the United States within its limits; and *Van Brocklin* v. *Tennessee*, 117 U. S. 151, to the same effect, apply *mutatis mutandis* to the bonds in question, and the tax upon them must, therefore, be invalid.

There is, in certain particulars, a want of uniformity in this law, which may have created in the minds of some the impression that it was studiously designed not only to shift the burden of taxation upon the wealthy class, but to exempt certain favored corporations from its operation. There is certainly no want of uniformity within the meaning of the Constitution, since we have repeatedly held that the uniformity there referred to is territorial only. *Loughborough* v. *Blake*, 5 Wheat. 317; *Head Money Cases*, 112 U. S. 580. In the words of the Constitution, the tax must be uniform "throughout the United States."

Irrespective, however, of the Constitution, a tax which is

wanting in uniformity among members of the same class is, or may be, invalid. But this does not deprive the legislature of the power to make exemptions, provided such exemptions rest upon some principle, and are not purely arbitrary, or created solely for the purpose of favoring some person or body of persons. Thus in every civilized country there is an exemption of small incomes, which it would be manifest cruelty to tax, and the power to make such exemptions once granted, the amount is within the discretion of the legislature, and so long as that power is not wantonly abused, the courts are bound to respect it. In this law there is an exemption of $4000, which indicates a purpose on the part of Congress, that the burden of this tax should fall on the wealthy, or at least upon the well-to-do. If men who have an income or property beyond their pressing needs are not the ones to pay taxes, it is difficult to say who are; in other words, enlightened taxation is imposed upon property and not upon persons. Poll taxes, formerly a considerable source of · revenue, are now practically obsolete. The exemption of $4000 is designed, undoubtedly, to cover the actual living expenses of the large majority of families, and the fact that it is not applied to corporations is explained by the fact that corporations have no corresponding expenses. The expenses of earning their profits are, of course, deducted in the same manner as the corresponding expenses of a private individual are deductible from the earnings of his business. The moment the profits of a corporation are paid over to the stockholders, the exemption of $4000 attaches to them in the hands of each stockholder.

The fact that savings banks and mutual insurance companies, whose profits are paid to policy holders, are exempted, is explicable on the theory, (whether a sound one or not, I need not stop to inquire,) that these institutions are not, in their original conception, intended as schemes for the accumulation of money; and if this exemption operates as an abuse in certain cases, and with respect to certain very wealthy corporations, it is probable that the recognition of such abuses was necessary to the exemption of the whole class.

It is difficult to overestimate the importance of these cases. I certainly cannot overstate the regret I feel at the disposition made of them by the court. It is never a light thing to set aside the deliberate will of the legislature, and in my opinion it should never be done, except upon the clearest proof of its conflict with the fundamental law. Respect for the Constitution will not be inspired by a narrow and technical construction which shall limit or impair the necessary powers of Congress. Did the reversal of these cases involve merely the striking down of the inequitable features of this law, or even the whole law, for its want of uniformity, the consequences would be less serious; but as it implies a declaration that every income tax must be laid according to the rule of apportionment, the decision involves nothing less than a surrender of the taxing power to the moneyed class. By resuscitating an argument that was exploded in the *Hylton case*, and has lain practically dormant for a hundred years, it is made to do duty in nullifying, not this law alone, but every similar law that is not based upon an impossible theory of apportionment. Even the spectre of socialism is conjured up to frighten Congress from laying taxes upon the people in proportion to their ability to pay them. It is certainly a strange commentary upon the Constitution of the United States and upon a democratic government that Congress has no power to lay a tax which is one of the main sources of revenue of nearly every civilized State. It is a confession of feebleness in which I find myself wholly unable to join.

While I have no doubt that Congress will find some means of surmounting the present crisis, my fear is that in some moment of national peril this decision will rise up to frustrate its will and paralyze its arm. I hope it may not prove the first step toward the submergence of the liberties of the people in a sordid despotism of wealth.

As I cannot escape the conviction that the decision of the court in this great case is fraught with immeasurable danger to the future of the country, and that it approaches the proportions of a national calamity, I feel it a duty to enter my protest against it.

MR. JUSTICE JACKSON dissenting.

I am unable to yield my assent to the judgment of the court in these cases. My strength has not been equal to the task of preparing a formal dissenting opinion since the decision was agreed upon. I concur fully in the dissents expressed by Mr. Justice White on the former hearing and by the Justices who will dissent now, and will only add a brief outline of my views upon the main questions presented and decided.

It is not and cannot be denied that, under the broad and comprehensive taxing power conferred by the Constitution on the national government, Congress has the authority to tax incomes from whatsoever source arising, whether from real estate or personal property or otherwise. It is equally clear that Congress, in the exercise of this authority, has the discretion to impose the tax upon incomes above a designated amount. The underlying and controlling question now presented is, whether a tax on incomes received from land and personalty is a "direct tax," and subject to the rule of apportionment.

The decision of the court, holding the income tax law of August, 1894, void, is based upon the following propositions:

First. That a tax upon real and personal property is a direct tax within the meaning of the Constitution, and, as such, in order to be valid, must be apportioned among the several States according to their respective populations. Second. That the incomes derived or realized from such property are an inseparable incident thereof, and so far partake of the nature of the property out of which they arise as to stand upon the same footing as the property itself. From these premises the conclusion is reached that a tax on incomes arising from both real and personal property is a "direct tax," and subject to the same rule of apportionment as a tax laid directly on the property itself, and not being so imposed by the act of 1894, according to the rule of numbers, is unconstitutional and void. Third. That the invalidity of the tax on incomes from real and personal property being established, the remaining portions of the income tax law are also void, notwithstanding the fact that such remaining portions clearly come within the

class of taxes designated as duties or excises in respect to which the rule of apportionment has no application, but which are controlled and regulated by the rule of uniformity.

It is not found, and could not be properly found by the court, that there is in the other provisions of the law any such lack of uniformity as would be sufficient to render these remaining provisions void for that reason. There is, therefore, no essential connection between the class of incomes which the court holds to be within the rule of apportionment and the other class falling within the rule of uniformity, and I cannot understand the principle upon which the court reaches the conclusion that, because one branch of the law is invalid for the reason that the tax is not laid by the rule of apportionment, it thereby defeats and invalidates another branch resting upon the rule of uniformity, and in respect to which there is no valid objection. If the conclusion of the court on this third proposition is sound, the principle upon which it rests could with equal propriety be extended to the entire revenue act of August, 1894.

I shall not dwell upon these considerations. They have been fully elaborated by Mr. Justice Harlan. There is just as much room for the assumption that Congress would not have passed the customs branches of the law without the provision taxing incomes from real and personal estate, as that they would not have passed the provision relating to incomes resting upon the rule of uniformity. Unconstitutional provisions of an act will, no doubt, sometimes defeat constitutional provisions where they are so essentially and inseparably connected in substance as to prevent the enforcement of the valid part without giving effect to the invalid portion. But when the valid and the invalid portions of the act are not mutually dependent upon each other as considerations, conditions, or compensation for each other, and the valid portions are capable of separate enforcement, the latter are never, especially in revenue laws, declared void because of invalid portions of the law.

The rule is illustrated in numerous decisions of this court and of the highest courts of the States. Take the *State Freight Tax Cases*, 15 Wall. 232. There was a single act imposing a

tonnage tax upon all railroads, on all freight transported by them.   The constitutionality of the law was attacked on the ground that it applied not merely to freight carried wholly within the State, but extended to freight received without and brought into the State, and to that received within and carried beyond the limits of the State, which came within the inter- state commerce provision of the Constitution of the United States.  ,This court held the tax invalid as to this latter class of freight; but, being valid as to the internal freight, that much of the law could not be defeated by the invalid part,, although the act imposing the tax was single and entire.   To the same effect are the cases of *Huntington* v. *Worthen*, 120 U. S. 97; *Allen* v. *Louisiana*, 103 U. S. 80; *Ratterman* v. *Western Union Telegraph Co.*, 127 U. S. 411 (where the point was directly made that the invalid part should defeat the valid part); and *Field* v. *Clark*, 143 U. S. 649, 696, 697.   In this last case this court said : " Unless it be impossible to avoid it, a general revenue statute should never be declared inopera- tive in all its parts because a particular part relating to a dis- tinct subject-matter may be invalid.   A different rule might be disastrous to the financial operations of the government and produce the utmost confusion in the business of the entire country."

Here the distinction between the two branches of the income tax law are entirely separable.   They rest upon different rules ; one part can be enforced without the other, and to hold that the alleged invalid portion, if invalid, should break down the valid portion, is a proposition which I think entirely erroneous, and wholly unsupported either upon principle or authority.

In considering the question whether a tax on incomes from real or personal estate is a direct tax within the meaning of those words as employed in the Constitution, I shall not enter upon any discussion of the decisions of this court, com- mencing with the *Hylton case* in 1796 (3 Dall. 171), and end- ing with the *Springer case* in 1880 (102 U. S. 507) ; nor shall I dwell upon the approval of those decisions by the great law- writers of the country and by all the commentators on the Constitution ; nor will I dwell upon the long-continued prac-

tice of the government in compliance with the principle laid down in those decisions. They, in my judgment, settle and conclude the question now before the court, contrary to the present decision. But, if they do not settle they certainly raise such a doubt on the subject as should restrain the court from declaring the act unconstitutional. No rule of construction is better settled than that this court will not declare invalid a statute passed by a coördinate branch of the government, in whose favor every presumption should be made, unless its repugnancy to the Constitution is clear beyond a reasonable doubt. In *Ogden* v. *Saunders*, 12 Wheat. 213, this court said that the mere fact of a doubt was sufficient to prevent the court from declaring the act unconstitutional, and that language in substance is repeated in the *Sinking Fund Cases*, 99 U. S. 700, where the opinion of the court was given by Chief Justice Waite, who said the act must be beyond all reasonable doubt unconstitutional before this court would so declare it.

It seems to me the court in this case adopts a wrong method of arriving at the true meaning of the words "direct tax" as employed in the Constitution. It attaches too much weight and importance to detached expressions of individuals and writers on political economy, made subsequent to the adoption of the Constitution, and who do not, in fact, agree upon any definition of a "direct tax." From such sources we derive no real light upon the subject. To ascertain the true meaning of the words "direct tax" or "direct taxes" we should have regard not merely to the words themselves, but to the connection in which they are used in the Constitution and to the conditions and circumstances existing when the Constitution was formed and adopted. What were the surrounding circumstances? I shall refer to them very briefly. The only subject of direct taxation prevailing at the time was land. The States did tax some articles of personal property, but such property was not the subject of general taxation by valuation or assessment. Land and its appurtenances was the principal object of taxation in all the States. By the VIIIth Article of the Confederation the expenses of the government were to be borne out

of a common treasury, to be supplied by the States according to the value of the granted and surveyed lands in each State, such valuation to be estimated or the assessment to be made by the Congress in such mode as they should from time to time determine.    This was a direct tax directly laid upon the value of all the real estate in the country.    The trouble with it was that the Confederation had no power of enforcing its assessment.    All it could do, after arriving at the assessment or estimate, was to make its requisitions upon the several States for their respective quotas.    They were not met.    This radical defect in the Confederation had to be remedied in the new Constitution, which accordingly gave to the national government the power of imposing taxation directly upon all citizens or inhabitants of the country, and to enforce such taxation without the agency or instrumentality of the States. The framers of the Constitution knew that land was the general object of taxation in all the States.    They found no fault with the VIIIth Article of the Confederation so far as it imposed taxation on the value of land and the appurtenances thereof in each State.

Now it may reasonably and properly be assumed that the framers of the Constitution in adopting the rule of apportionment, according to the population of the several States, had reference to subjects or objects of taxation of universal or general distribution throughout all the States.    A capitation or poll tax had its subject in every State, and was, so to speak, self-apportioning according to numbers.    "Other direct tax" used in connection with such capitation tax must have been intended to refer to subjects having like, or approximate, relation to numbers, and found in all the States.    It never was contemplated to reach by direct taxation subjects of partial distribution.    What would be thought of a direct tax and the apportionment thereof laid upon cotton at so much a bale, upon tobacco at so much a hogshead, upon rice at so much a ton or a tierce?    Would not the idea of apportioning that tax on property, non-existing in a majority of the States, be utterly frivolous and absurd?

Not only was land the subject of general distributions, but

evidently in the minds of the framers of the Constitution from the fact that it was the subject of taxation under the Confederation.  But at the time of the adoption of the Constitution there was, with the single exception of a partial income tax in the State of Delaware, no general tax on incomes in this country nor in any State thereof.  Did the framers of the Constitution look forward into the future so as to contemplate and intend to cover such a tax as was then unknown to them ? I think not.

It was ten or eleven years after the adoption of the Constitution before the English government passed her first income tax law under the leadership of Mr. Pitt.  The question then arose, to which the Chief Justice has referred, whether, in estimating income, you could look or have any regard to the source from which it sprung.  That question was material, because, by the English loan acts it was provided that the public dividends should be paid "free of any tax or charge whatever," and Mr. Pitt was confronted with the question on his income tax law whether he proposed to reach or could reach income from those stocks.  He said the words must receive a reasonable interpretation, and that the true construction was that you should not look at all to the nature of the source, but that you should consider dividends, for the purpose of the income tax, simply in the relation to the receiver as so much income.  This construction was adopted and put in practice for over fifty years without question.  In 1853 Mr. Gladstone, as Chancellor of the Exchequer, resisting with all his genius the effort to make important changes of the income tax, said, in a speech before the House of Commons, that the construction of Mr. Pitt was undoubtedly correct.  These opinions of distinguished statesmen may not have the force of judicial authority, but they show what men of eminence and men of ability and distinction thought of the income tax at its original inception.

If the assumption I have made that the framers of the Constitution in providing for the apportionment of a direct tax had in mind a subject-matter or subjects-matter, which had some general distribution among the States is correct, it is

clear that a tax on incomes — a subject not of general distribution at that time or since — is not a " direct tax " in the sense of the Constitution.

The framers of the Constitution proceeded upon the theory entertained by all political writers of that day, that there was some relation, more or less direct, between population and land. But there is no connection, direct or proximate, between rents of land and incomes of personalty and population — none whatever. They did not have any relation to each other at the time the Constitution was adopted, nor have they ever had since, and perhaps never will have.

Again, it is settled by well-considered authorities that a tax on rents and a tax on land itself is not duplicate or double taxation. The authorities in England and in this country hold that a tax on rents and a tax on land are different things. Besides the English cases, to which I have not the time or strength to refer, there is the well-considered case of *Robinson* v. *The County of Allegheny*, 7 Penn. St. 161, when Gibson was the Chief Justice of the Supreme Court of Pennsylvania, holding that a tax on rent is not a tax on the land out of which it arises. In that case there was a *lease in fee* of certain premises, the lessee covenanting to pay all taxes on the demised premises. A tax was laid by the State upon both land and rent, and the question arose whether the tenant, even under that express covenant, was bound to pay the tax on the land itself. The Supreme Court of the State held that he was not; that there were two separate, distinct, and independent subjects-matter; and that his covenant to pay on the demised premises did not extend to the payment of the tax charged upon the rent against the land owner. All the circumstances surrounding the formation and adoption of the Constitution lead to the conclusion that only such tax as is laid directly upon property as such, according to valuation or assessment, is a " direct tax " within the true meaning of the Constitution.

Again, we cannot attribute to the framers of the Constitution an intention to make any tax a direct tax which it was impossible to apportion. If it cannot be apportioned without

gross injustice, we may feel assured that it is a tax never contemplated by the Constitution as a direct tax. No tax, therefore, can be regarded as a direct tax, in the sense of that instrument, which is incapable of apportionment by the rule of numbers. The constitutional provision clearly implies in the requirement of apportionment that a direct tax is such, and such only, as can be apportioned without glaring inequality, manifest injustice, and unfairness as between those subject to its burden. The most natural and practical test by which to determine what is a direct tax in the sense of the Constitution is to ascertain whether the tax can be apportioned among the several States according to their respective numbers, with reasonable approximation to justice, fairness, and equality to all the citizens and inhabitants of the country who may be subject to the operation of the law. The fact that a tax cannot be so apportioned without producing gross injustice and inequality among those required to pay it should settle the question that it was not a direct tax within the true sense and meaning of those words as they are used in the Constitution.

Let us apply this test. Take the illustration suggested in the opinion of the court. Congress lays a tax of thirty millions upon the incomes of the country above a certain designated amount, and directs that tax to be apportioned among the several States according to their numbers, and when so apportioned to be pro-rated amongst the citizens of the respective States coming within the operation of the law. To two States of equal population the same amount will be allotted. In one of these States there are 1000 individuals and in the other 2000 subject to the tax. The former under the operation of the apportionment will be required to pay *twice* the rate of the latter on the same amount of income. This disparity and inequality will increase just in proportion as the numbers subject to the tax in the different States differ or vary. By way of further illustration, take the new State of Washington and the old State of Rhode Island, having about the same population. To each would be assigned the same amount of the general assessment. In the former, we will say, there are 5000 citizens subject to the operation of the law, in the latter

50,000. The citizen of Washington will be required to pay ten times as much as the citizen of Rhode Island on the *same amount* of taxable income. Extend the rule to all the States, and the result is that the larger the number of those subject to the operation of the law in any given State, the smaller their proportion of the tax and the smaller their rate of taxation, while, in respect to the smaller number in other States, the greater will be their rate of taxation on the same income.

But it is said that this inequality was intentional upon the part of the framers of the Constitution; that it was adopted with a view to protect property owners as a class. Where does such an idea find support or countenance under a Constitution framed and adopted "to promote justice?" The government is not dealing with the States in this matter; it is dealing with its own citizens throughout the country, irrespective of state lines, and to say that the Constitution, which was intended to promote peace and justice, either in its whole or in any part thereof, ever intended to work out such a result, and produce such gross discrimination and injustice between the citizens of a common country, is beyond all reason.

What is to be the end of the application of this new rule adopted by the court? A tax is laid by the general government on all the money on hand or on deposit of every citizen of the government at a given date. Such taxation prevails in many of the States. The government has, under its taxing power, the right to lay such a tax. When laid a few parties come before the court and say: "My deposits were derived from the proceeds of farm products or from the interest on bonds and securities, and they are not, therefore, taxable by this law." To make your tax valid you must apportion the tax amongst all the citizens of the government, according to the population of the respective States, taking the whole subject-matter out of the control of Congress, both the rate of taxation and the assessment, and imposing it upon the people of the country by an arbitrary rule which produces such inequality as I have briefly pointed out.

In my judgment the principle announced in the decision practically destroys the power of the government to reach

incomes from real and personal estate.   There is to my mind little or no real difference between denying the existence of the power to tax incomes from real and personal estate, and attaching such conditions and requirements to its exercise as will render it impossible or incapable of any practical operation.   You might just as well in this case strike at the power to reach incomes from the sources indicated as to attach these conditions of apportionment which no legislature can ever undertake to adopt, and which, if adopted, cannot be enforced with any degree of equality or fairness between the common citizens of a common country.

The decision disregards the well-established canon of construction to which I have referred, that an act passed by a coördinate branch of the government has every presumption in its favor, and should never be declared invalid by the courts unless its repugnancy to the Constitution is clear beyond all reasonable doubt.   It is not a matter of conjecture; it is the established principle that it must be clear beyond a reasonable doubt.   I cannot see, in view of the past, how this case can be said to be free of doubt.

Again, the decision not only takes from Congress its rightful power of fixing the rate of taxation, but substitutes a rule incapable of application without producing the most monstrous inequality and injustice between citizens residing in different sections of their common country, such as the framers of the Constitution never could have contemplated, such as no free and enlightened people can ever possibly sanction or approve.

The practical operation of the decision is not only to disregard the great principles of equality in taxation, but the further principle that in the imposition of taxes for the benefit of the government the burdens thereof should be imposed upon those having most *ability* to bear them.   This decision, in effect, works out a directly opposite result, in relieving the citizens having the greater *ability*, while the burdens of taxation are made to fall most heavily and oppressively upon those having the least ability.   It lightens the burden upon the larger number, in some States subject to the tax, and places it most un-

equally and disproportionately on the smaller number in other States.    Considered in all its bearings, this decision is, in my judgment, the most disastrous blow ever struck at the constitutional power of Congress.    It strikes down an important portion of the most vital and essential power of the government in practically excluding any recourse to incomes from real and personal estate for the purpose of raising needed revenue to meet the government's wants and necessities under any circumstances.

I am therefore compelled to enter my dissent to the judgment of the court.

MR. JUSTICE WHITE dissenting.

I deem it unnecessary to elaborate my reasons for adhering to the views hitherto expressed by me, and content myself with the following statement of points:

1st.  The previous opinion of the court held that the inclusion of rentals from real estate in income subject to taxation laid a direct tax on the real estate itself, and was, therefore, unconstitutional and void, unless apportioned.    From this position I dissented, on the ground that it overthrew the settled construction of the Constitution, as applied in one hundred years of practice, sanctioned by the repeated and unanimous decisions of this court, and taught by every theoretical and philosophical writer on the Constitution who has expressed an opinion upon the subject.

2d.  The court in its present opinion considers that the Constitution requires it to extend the former ruling yet further, and holds that the inclusion of revenue from personal property in an income subjected to taxation amounts to imposing a direct tax on the personal property, which is also void, unless apportioned.    As a tax on income from real and personal property is declared to be unconstitutional unless apportioned, because it is equivalent to a direct tax on such property, it follows that the decision now rendered holds not only that the rule of apportionment must be applied to an income tax, but also that no tax, whether direct or indirect, on either real and personal property or investments can be levied unless by apportionment.    Every-

thing said in the dissent from the previous decision applies to the ruling now announced, which, I think, aggravates and accentuates the court's departure from the settled construction of the Constitution.

3d. The court does not now, except in some particulars, review the reasoning advanced in support of its previous conclusion, and therefore the opinion does not render it necessary for me to do more than refer to the views expressed in my former dissent, as applicable to the position now taken and then to briefly notice the new matter advanced.

4th. As, however, on the rehearing, the issues have been elaborately argued, I deem it also my duty to state why the reargument has in no way shaken, but on the contrary has strengthened, the convictions hitherto expressed.

5th. The reasons urged on the reargument seem to me to involve a series of contradictory theories:

*a.* Thus, in answering the proposition that *United States* v. *Hylton* and the cases which followed and confirmed it, have settled that the word "direct," as used in the Constitution, applies only to capitation taxes and taxes on land, it is first contended that this claim is unfounded, and that nothing of the kind was so decided, and it is then argued that "a century of error" should furnish no obstacle to the reversal, by this court, of a continuous line of decisions interpreting the constitutional meaning of that word, if such decisions be considered wrong. Whence the "century of error" is evolved, unless the cases relied on decided that the word "direct" was not to be considered in its economic sense, does not appear from the argument.

*b.* In answer to the proposition that the passage of the carriage-tax act and the decision in the *Hylton case* which declared that act constitutional, involved the assumption that the word "direct" in the Constitution was to be considered as applying only to a tax on land and capitation, it is said that this view of the act and decision is faulty, and, therefore, the inference deduced from it is erroneous. At the same time reference is made to the opinion of Mr. Madison, that the carriage-tax act was passed in violation of the Consti-

tution, and hence that the decision which held it constitutional was wrong. How that distinguished statesman could have considered that the act violated the Constitution, and how he could have regarded the decision which affirmed its validity as erroneous, unless the act and decision were not in accord with his view of the meaning of the word "direct" the argument also fails to elucidate.

6th. Attention was previously called to the fact that practically all the theoretical and philosophical writers on the Constitution, since the carriage-tax act was passed and the *Hylton case* was decided, have declared that the word "direct" in the Constitution applies only to taxes on land and capitation taxes. The list of writers, formerly referred to, with the addition of a few others not then mentioned, includes Kent, Story, Cooley, Miller, Bancroft, the historian of the Constitution, Pomeroy, Hare, Burroughs, Ordroneaux, Black, Farrar, Flanders, Bateman, Patterson, and Von Holst. How is this overwhelming *consensus* of publicists, of law writers, and historians answered? By saying that their opinions ought not to be regarded, because they were all misled by the *dicta* in the *Hylton case* into teaching an erroneous doctrine. How, if the *Hylton case* did not decide this question of direct taxation, it could have misled all these writers — among them some of the noblest and brightest intellects which have adorned our national life — is not explained. In other words, in order to escape the effect of the act and of the decision upon it, it is argued that they did not, by necessary implication, establish that direct taxes were only land and capitation taxes, and in the same breath, in order to avoid the force of the harmonious interpretation of the Constitution by all the great writers who have expounded it, we are told that their views are worthless because they were misled by the *Hylton case.*

7th. If, as is admitted, all these authors have interpreted the *Hylton case* as confining direct taxes to land and capitation taxes, I submit that their unanimity, instead of affording foundation for the argument that they were misled by that case, furnishes a much better and safer guide as to what its decision necessarily implied, than does the contention now

made, unless we are to hold that all these great minds were
so feeble as to be led into concluding that the case decided
what it did not decide, and unless we are to say that the true
light in regard to the meaning of this word "direct" has
come to no writer or thinker from that time until now.

8th. Whilst it is admitted that in the discussions at the
bar of this court in years past, when the previous cases were
before it, copious reference was made to the lines of authority
here advanced, and that nothing new is now urged, we are,
at the same time, told that, strange as it may seem, the sources
of the Constitution have been "neglected" up to the present
time; and this supposed neglect is asserted in order to justify
the overthrow of an interpretation of the Constitution con-
cluded by enactments and decisions dating from the founda-
tion of the government. How this neglect of the sources of
the Constitution in the past is compatible with the admission
that nothing new is here advanced, is not explained.

9th. Although the opinions of Kent, Story, Cooley, and all
the other teachers and writers on the Constitution are here
disregarded in determining the constitutional meaning of the
word "direct," the opinions of some of the same authors are
cited as conclusive on other questions involved in this case.
Why the opinions of these great men should be treated as
"worthless" in regard to one question of constitutional law,
and considered conclusive on another, remains to be dis-
covered.

10th. The same conflict of positions is presented in other
respects. Thus, in support of various views upon incidental
questions, we are referred to many opinions of this court as
conclusive, and, at the same time, we are told that all the
decisions of this court from the *Hylton case* down to the
*Springer case* in regard to direct taxation are wrong if they
limit the word "direct" to land and capitation, and must,
therefore, be disregarded, because "a century of error" does
not suffice to determine a question. How the decisions of
this court settling one principle are to be cited as authority
for that principle, and, at the same time, it is to be argued,
that other decisions, equally unanimous and concurrent, are

no authority for another principle, involves a logical dilemma, which cannot be solved.

11th. In dissenting before, it was contended that the passage of the carriage-tax act and the decision of this court thereon had been accepted by the Legislative and Executive branches of the government from that time to this, and that this acceptance had been manifested by conforming all taxes thereafter imposed to the rule of taxation thus established. This is answered by saying that there was no such acceptance, because the mere abstention from the exercise of a power affords no indication of an intention to disown the power. The fallacy here consists in confusing action with inaction. It was not reasoned in the previous dissent that mere inaction implied the lack of a governmental power, but that the definitive action in a particular way, when construed in connection with the Hylton decision, established a continuous governmental interpretation.

12th. Whilst denying that there has been any rule evolved from the *Hylton case* and applied by the government for the past hundred years, it is said that the results of that case were always disputed when enforced. How there could be no rule, and yet the results of the rule could be disputed, is likewise a difficulty which is not answered.

13th. The admission of the dispute was necessitated by the statement that when, in 1861, it was proposed to levy a direct tax, by apportionment, on personal property, a committee of the House of Representatives reported that under the *Hylton case* it could not be done. This fact, if accurately stated, furnishes the best evidence of the existence of the rule which the *Hylton case* had established, and shows that the decision now made reverses that case, and sustains the contention of the minority who voted against the carriage-tax act, and whose views were defeated in its passage and repudiated in the decision upon it, and have besides been overthrown by the unbroken history of the government and by all the other adjudications of this court confirming the *Hylton case.*

14th. The decision here announced holding that the tax on the income from real estate and the tax on the income from

personal property and investments are direct, and therefore require apportionment, rests necessarily on the proposition that the word "direct" in the Constitution must be construed in the economic sense; that is to say, whether a tax be direct or indirect is to be tested by ascertaining whether it is capable of being shifted from the one who immediately pays it to an ultimate consumer.  If it cannot be so shifted, it is direct; if it can be, it is indirect.  But the word in this sense applies not only to the income from real estate and personal property, but also to business gains, professional earnings, salaries, and all of the many sources from which human activity evolves profit or income without invested capital.  These latter the opinion holds to be taxable without apportionment, upon the theory that taxes on them are "excises," and, therefore, do not require apportionment according to the previous decisions of this court on the subject of income taxation.  These decisions, *Hylton* v. *United States*, 3 Dall. 171; *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433; *Veazie Bank* v. *Fenno*, 8 Wall. 533; *Scholey* v. *Rew*, 23 Wall. 331; *Springer* v. *United States*, 102 U. S. 586, hold that the word "direct" in the Constitution refers only to direct taxes on land, and therefore has a constitutional significance wholly different from the sense given to that word by the economists.  The ruling now announced overthrows all these decisions.  It also subverts the economic signification of the word "direct" which it seemingly adopts.  Under that meaning, taxes on business gains, professional earnings, and salaries are as much direct, and, indeed, even more so, than would be taxes on invested personal property.  It follows, I submit, that the decision now rendered accepts a rule and at once in part overthrows it.  In other words, the necessary result of the conclusion is to repudiate the decisions of this court, previously rendered, on the ground that they misinterpreted the word "direct," by not giving it its economic sense, and then to decline to follow the economic sense because of the previous decisions.  Thus the adoption of the economic meaning of the word destroys the decisions, and they in turn destroy the rule established.  It follows, it seems to me, that the conclusion now announced rests neither upon

the economic sense of the word "direct" or the constitutional significance of that term. But it must rest upon one or the other to be sustained. Resting on neither, it has, to my mind, no foundation in reason whatever.

15th. This contradiction points in the strongest way to what I conceive to be the error of changing, at this late day, a settled construction of the Constitution. It demonstrates, I think, how conclusively the previous cases have determined every question involved in this, and shows that the doctrine cannot be now laid down that the word "direct" in the Constitution is to be interpreted in the economic sense, and be consistently maintained.

16th. The injustice of the conclusion points to the error of adopting it. It takes invested wealth and reads it into the Constitution as a favored and protected class of property, which cannot be taxed without apportionment, whilst it leaves the occupation of the minister, the doctor, the professor, the lawyer, the inventor, the author, the merchant, the mechanic, and all other forms of industry upon which the prosperity of a people must depend, subject to taxation without that condition. A rule which works out this result, which, it seems to me, stultifies the Constitution by making it an instrument of the most grievous wrong, should not be adopted, especially when, in order to do so, the decisions of this court, the opinions of the law writers and publicists, tradition, practice, and the settled policy of the government must be overthrown.

17th. Nor is the wrong, which this conclusion involves, mitigated by the contention that the doctrine of apportionment now here applied to indirect as well as direct taxes on all real estate, and invested personal property, leaves the government with ample power to reach such property by taxation, and make it bear its just part of the public burdens. On the contrary, instead of doing this, it really deprives the government of the ability to tax such property at all, because the tax, it is now held, must be imposed by the rule of apportionment according to population. The absolute inequality and injustice of taxing wealth by reference to population and

without regard to the amount of the wealth taxed are so manifest that this system should not be extended beyond the settled rule which confines it to direct taxes on real estate. To destroy the fixed interpretation of the Constitution, by which the rule of apportionment according to population, is confined to direct taxes on real estate so as to make that rule include indirect taxes on real estate and taxes, whether direct or indirect, on invested personal property, stocks, bonds, etc., reads into the Constitution the most flagrantly unjust, unequal, and wrongful system of taxation known to any civilized government. This strikes me as too clear for argument. I can conceive of no greater injustice than would result from imposing on one million of people in one State, having only ten millions of invested wealth, the same amount of tax as that imposed on the like number of people in another State having fifty times that amount of invested wealth. The application of the rule of apportionment by population to invested personal wealth would not only work out this wrong, but would ultimately prove a self-destructive process, from the facility with which such property changes its *situs.* If so taxed, all property of this character would soon be transferred to the States where the sum of accumulated wealth was greatest in proportion to population, and where therefore the burden of taxation would be lightest, and thus the mighty wrong resulting from the very nature of the extension of the rule would be aggravated. It is clear then, I think, that the admission of the power of taxation in regard to invested personal property, coupled with the restriction that the tax must be distributed by population and not by wealth, involves a substantial denial of the power itself, because the condition renders its exercise practically impossible. To say a thing can only be done in a way which must necessarily bring about the grossest wrong, is to delusively admit the existence of the power, while substantially denying it. And the grievous results sure to follow from any attempt to adopt such a system are so obvious that my mind cannot fail to see that if a tax on invested personal property were imposed by the rule of population, and there were no other means of preventing

its enforcement, the red spectre of revolution would shake our institutions. to their foundation.

18th. This demonstrates the fallacy of the proposition that the interpretation of the Constitution now announced concedes to the national government ample means to sustain itself by taxation in an extraordinary emergency. It leaves only the tariff or impost, excise taxation, and the direct or indirect taxes on. the vital energies of the country, which, as I have said, the opinion now holds are not subject to the rule of apportionment. In case of foreign war, embargo, blockade, or other international complications, the means of support from tariff taxation would disappear ; none of the accumulated invested property of the country could be reached, except according to the impracticable rule of apportionment; and even indirect taxation on real estate would be unavailable, for the opinion now announces that the rule of apportionment applies to an indirect as well as a direct tax on such property. The government would thus be practically deprived of the means of support.

19th. The claim that the States may pay the amount of the apportioned tax and thus save the injustice to their citizens resulting from its enforcement, does not render the conclusion less hurtful. In the first place, the fact that the State may pay the sum apportioned in no way lessens the evil, because the tax, being assessed by population and not by wealth, must, however paid, operate the injustice which I have just stated. Moreover, the contention that a State could by payment of the whole sum of a tax on personal property, apportioned according to population, relieve the citizen from grievous wrong to result from its enforcement against his property, is an admission that the collection of such tax against the property of the citizen, because of its injustice, would be practically impossible. If substantially impossible of enforcement against the citizen's property, it would be equally so as against the State, for there would be no obligation on the State to pay, and thus there would be no power whatever to enforce. Hence, the decision now rendered, so far as taxing real and personal property and invested wealth is concerned,

reduces the government of the United States to the paralyzed condition which existed under the Confederation, and to remove which the Constitution of the United States was adopted.

20th. The suggestion that if the construction now adopted, by the court, brings about hurtful results, it can be cured by an amendment to the Constitution instead of sustaining the conclusion reached, shows its fallacy. The *Hylton case* was decided more than one hundred years ago. The income tax laws of the past were enacted also years ago. At the time they were passed, the debates and reports conclusively show that they were made to conform to the rulings in the *Hylton case.* Since all these things were done, the Constitution has been repeatedly amended. These amendments followed the civil war, and were adopted for the purpose of supplying defects in the national power. Can it be doubted that if an intimation had been conveyed that the decisions of this court would or could be overruled, so as to deprive the government of an essential power of taxation, the amendments would have rendered such a change of ruling impossible? The adoption of the amendments, none of which repudiated the uniform policy of the government, was practically a ratification of that policy and an acquiescence in the settled rule of interpretation theretofore adopted.

21st. It is, I submit, greatly to be deplored that, after more than one hundred years of our national existence, after the government has withstood the strain of foreign wars and the dread ordeal of civil strife, and its people have become united and powerful, this court should consider itself compelled to go back to a long repudiated and rejected theory of the Constitution, by which the government is deprived of an inherent attribute of its being, a necessary power of taxation.